861 So.2d 400 (2003)
A.W.G.
v.
JEFFERSON COUNTY DEPARTMENT OF HUMAN RESOURCES.
2010800.
Court of Civil Appeals of Alabama.
April 18, 2003.
*402 W. Davis Lawley, Jr., Birmingham, for appellant.
William H. Pryor, Jr., atty. gen., and J. Coleman Campbell, deputy atty. gen., and Lynn S. Merrill, asst. atty. gen., Department of Human Resources, for appellee.
PITTMAN, Judge.
A.W.G. ("the mother") appeals a juvenile court's judgment terminating her parental rights as to A.B.G. ("the child").
The genesis of this case is very convoluted. In September 1999, when the child was just six months old, the mother and R.G. ("the father") had an argument that culminated in the father's threatening the mother with a machete. The Jefferson County Department of Human Resources ("DHR") took custody of the child on September 7, 1999. The dependency action filed by DHR on September 9, 1999, alleged that the child's parents were separated and involved in an ongoing custody dispute and that neither parent had established a place for the child to live. At a shelter-care hearing in September 1999, the juvenile court declared the child dependent and awarded DHR temporary custody of the child. On September 16, 1999, the trial court issued an order stating that the mother could regain custody of her child if she moved into a domesticabuse shelter, began attending parenting classes, and agreed to undergo random drug testing.
On July 31, 2000, over the objection of counsel and without the mother's being present, the juvenile court entered a default judgment of dependency against the mother and directed her to pay child support to DHR. The court noted in its order that at that time the case had been pending 11 months; it directed DHR to comply with the federal permanency statutes requiring that a plan be presented to the trial court within 12 months of taking custody of a child. See Adoption and Safe Families Act, 42 U.S.C. § 671 and § 675 ("ASFA"). The juvenile court set the case for a dispositional review hearing to be held on October 4, 2000.
At the October 4, 2000, hearing, after DHR had submitted a report concerning the case, the juvenile court continued DHR's custody of the child and found that reunification was contrary to the best interest of the child. At that time, the juvenile court did not approve the case plan submitted by DHR pursuant to the ASFA. The juvenile court set the case for another review hearing on January 10, 2001. Following that hearing, the juvenile court held that DHR had failed to comply with the ASFA and with the court's order of October 4, 2000, and noted that the child remained in foster care and that no permanency plan was being pursued. The juvenile court noted that all parties were present at that time, but that before the hearing the court had been unable to locate either the mother or the father for lengthy periods of time. The juvenile court ordered the father to undergo drug screening and set the case for trial on February 22, 2001.
On January 31, 2001, DHR filed a petition to terminate the parental rights of the mother and the father based upon their having failed to comply with certain provisions of the July 31, 2000, default dependency judgment. On February 20, 2001, *403 the child's maternal grandmother, R.A., filed a motion to intervene; arguments concerning her motion were heard at the trial previously set for February 22, 2001. Following that hearing, the juvenile court entered an order conditionally granting the maternal grandmother's petition to intervene. Because the mother had not been served with the petition to terminate her parental rights, she was served on February 22, 2001, and the juvenile court reset the trial for April 26, 2001; however, on April 26, 2001, the juvenile court continued the trial to August 14, 2001.
At the end of July 2001, the mother's attorney sent the juvenile court a letter regarding counsel's potential scheduling conflicts. On August 7, 2001, the mother's attorney filed a motion in limine to suppress all court reports filed before the trial. Also filed at that time was a motion requesting the guardian ad litem and DHR to produce all documents pertinent to the proceedings. Numerous reports were placed in the court file during the pendency of this action, some stamped "filed in court" and some neither stamped nor marked as filed in court (such as DHR's court reports dated November 10, 1999; July 31, 2000; January 10, 2001; February 22, 2001; and August 14, 2001). The DHR reports dated February 22, 2001, and August 14, 2001, were filed in court during the trial held on August 14 and 15, 2001.
Vivian Hunter, a DHR child-abuse-and-neglect investigator, and Tikiella Sanders, the DHR caseworker who had been assigned to the child's case since January 2001, testified at trial. Although these DHR employees had prepared some of the reports appearing in the record, certain reports were offered into evidence that had been prepared by persons other than the two DHR witnesses. The mother's attorney and the father's attorney objected to the introduction of the reports not prepared by Hunter or Sanders, and the juvenile court allowed counsel a "continuing" objection throughout the trial. Both the father and the mother also testified.
Hunter testified that she had been assigned to this case from September 1999 through January 2000. She stated that she had personally prepared the DHR reports dated November 10, 1999, December 1, 1999, and January 7, 2000. The juvenile court admitted those three reports into evidence at the trial. Hunter stated that during the time she was handling the case, the mother did not comply with the court's September 16, 1999, order in that she did not move into a domestic-abuse shelter, did not take any domestic-abuse or parenting classes, and did not undergo any of the court-ordered random drug testing. Hunter also testified that she completed a home evaluation for the mother and for D.L., a cousin of the father. Those evaluations concluded that D.L. would be an acceptable placement except for the fact that the father was then living in that residence. Because of the threat of future violence, it was determined that D.L.'s home was not an acceptable placement for the child at the time of Hunter's evaluations.
Sanders testified that she had been the social worker assigned to the case since January 2001. She authenticated a DHR court report dated March 29, 2000; she stated that she did not write that report but that she had seen it in the DHR files of the case. The juvenile court admitted the report (DHR Exhibit 5) over the objection of the mother's attorney.
Sanders testified that she had prepared two court reports: one dated February 22, 2001, and one dated August 14, 2001. Those reports were admitted over objections by both the mother's and the father's attorneys. Sanders stated that she had talked to the father only once during the *404 months that she had been the caseworker; that the father had never given DHR an address or telephone number by which he could be reached; that the father had never paid any child support; and that the father had not complied with any of the juvenile court's previous orders.
On cross-examination, Sanders testified that she had not visited the home where the mother currently lives. She also reiterated that none of the father's or the mother's relatives were reviewed before the hearing to determine if any of them would qualify as an alternative placement. Sanders testified that since January 2001, the mother had consistently visited with the child. On the other hand, Sanders testified that the mother had not submitted to random drug screening, had not provided any child support, had not maintained steady employment, and had not provided proof of attendance at parenting or anger-management classes.
Sanders also testified that although DHR could help the mother obtain public housing and could provide transportation to all of the court-ordered classes, she had not discussed those services with the mother. Sanders testified that she had written only one of three court reports marked DHR Exhibits 13, 14, and 15.[1] The juvenile court admitted all three exhibits over the objections of the mother's and the father's attorneys. Sanders also testified that DHR is required by the federal ASFA to file a petition to terminate parental rights if a child has been in DHR's custody more than 13 months with no improvement on the part of the parents. See 42 U.S.C. § 671 and § 675.
The father testified that he had learning disabilities and that he had been "dismissed" from school in the ninth grade. He remembered having appeared in court in July 2000, but did not remember signing an agreement to undergo random drug screening, to attend parenting classes, or to pay child support every month. He admitted that he had not taken any affirmative action to regain custody of his child and that he had not obeyed any of the previous court orders. He stated that at the time of the hearing he was incarcerated in the Bessemer jail because he had been arrested and charged with third-degree domestic violence, assault and resisting arrest.
The mother testified that immediately after the child had been taken into DHR custody she had tried to enter a domesticviolence shelter. The mother stated that at the time of the shelter-care hearing in September 1999 all of the area shelters were full and could not accommodate the mother and the child. Approximately three weeks later, the mother learned that "floor space" was available in a shelter, but she told the DHR caseworker that she would not move into a shelter only to have the child sleep on the floor. The mother admitted that a DHR caseworker had then performed an evaluation of a house belonging to a friend of the mother in Springville, with whom the mother was staying, and determined it to be inadequate. The mother testified that because she did not have a driver's license, she continued to rely on friends to provide her with transportation to work and to meetings with DHR.
The mother stated that she had worked at a McDonald's restaurant near the friend's house for about six months, but that she had moved because DHR had determined that the friend's house was not *405 an appropriate place for the child to live. She eventually moved back into her mother's house, which is where she and the father were living when the child was originally removed by DHR. The mother stated that she was able to obtain public housing during a period in which she was working at a Burger King restaurant in Gardendale; she stated that she had had a miscarriage and that because of health problems resulting from the miscarriage, she became unemployed. The mother testified that she had been living in a house with Kevin Harris and his parents in Trafford immediately before trial. The mother stated that she had taken some domesticviolence classes and some parenting classes through the YWCA in Blount County. The juvenile court accepted into evidence a certificate showing that the mother had completed a domestic-violence class.
The mother also testified that she recently had undergone a drug-dependency assessment performed by professionals at the Bradford Assessment Center in Warrior. She stated that Bradford did not give her any written assessment and that she could not afford to pay to remain in programs at the facility. The mother stated that she believed her biggest problem in fulfilling the juvenile court's orders was the lack of transportation to attend random drug screening, counseling, DHR meetings, parenting classes, and visits with the child.
The mother also testified that she had not used illicit drugs for two years and that she had attempted to find a steady job and a stable home in which to raise the child. The mother testified that she had been abused by her mother when she was a child and that she was removed from her mother by DHR after having been sexually abused by her stepfather's father. The mother offered results of a drug test she had taken in February 2000 that indicated that she was drug-free at that time; the juvenile court admitted those test results into evidence. The mother stated that during the week of the hearing she had moved into the house of relatives of her boyfriend in Center Point in order to be on a bus route, so that she would have a transportation option.
Nine days after the hearing, but before the juvenile court had entered a judgment in the case, the mother's attorney filed a motion alleging that the August 14, 2001, hearing should be declared a mistrial based on a conflict of interest on the part of the guardian ad litem. The motion stated that two days after the trial had ended, the guardian ad litem had informed the mother's and the father's attorneys that an attorney from Legal Aid had represented the mother as a guardian ad litem in a dependency case some years before the trial in this case, when the mother was a minor. The mother's attorney argued that that fact created a presumption of conflict that required a mistrial or retrial. On August 23, 2001, the guardian ad litem filed with the juvenile court a notice of potential conflict. The juvenile court issued an order reserving its ruling on the motion until the Alabama State Bar could respond to the judge's request for an opinion. The Alabama State Bar responded on August 29, 2001, in a letter outlining two criteria required for disqualification. The letter stated that for a conflict to exist (1) the two matters must be substantially related and (2) a lawyer remaining in the office must have confidential information concerning the matter that could be used to the detriment of the former client. Based on the facts of this case, the letter concluded that the matters were not substantially related and, therefore, no conflict of interest existed.
*406 The mother's motion was initially set for hearing on September 4, 2001, but was reset several times and was scheduled for a hearing on February 11, 2002. On December 6, 2001, the juvenile court set the maternal grandmother's petition to intervene for hearing on February 11, 2002, as well. DHR submitted a report to the juvenile court on February 11, 2002; however, the juvenile court continued the hearing from February 11 to March 4, 2002, at which time DHR filed yet another report on the case. The mother's attorney filed an objection to that DHR report. The juvenile court set a final hearing on all pending matters for April 22, 2002; this hearing was later reset to May 3, 2002.
However, on April 26, 2002, the juvenile court entered a judgment terminating the parental rights of both the mother and the father. In its judgment, the juvenile court found that the child was dependent, and it concluded that DHR had "investigated all relative resources and none [we]re found to be suitable." While the juvenile court found that the child had been moved into an adoptive-placement foster home only one week before trial, that court also specifically found that "it is in the best interest and welfare of the child and the least restrictive alternative that the mother and the father be relieved of custody" of the child. Only the mother has appealed from the juvenile court's judgment.
"The juvenile court's decision to terminate parental rights, which is based on evidence presented ore tenus, is presumed correct and will be reversed only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong."
M.H. v. Calhoun County Department of Human Resources, 848 So.2d 1011, 1013 (Ala.Civ.App.2002). The mother argues that the juvenile court erred in terminating her parental rights based primarily on hearsay contained in court reports admitted during the trial.
While the trial in the juvenile court occurred before Y.M. v. Jefferson County Dep't of Human Res., [Ms. 2010755, January 24, 2003] ___ So.2d ___ (Ala.Civ.App. 2003), was decided, the mother's main contention is similar to that raised by the appellant in Y.M. The main opinion in Y.M., the opinion of two judges of this court, discusses differences between adjudicatory and dispositional phases in a termination-of-parental-rights proceeding. The main opinion in Y.M. carefully reviewed the provisions of Ala.Code 1975, § 12-15-65(f) and (h), as well as § 12-15-71(a), and concluded "that a parental-rights-termination hearing is an adjudicatory proceeding at which hearsay evidence, which is permitted by § 12-15-65(h) in a dispositional proceeding, is inadmissible." Y.M., ___ So.2d at ___.
Assuming, without deciding, that the distinction drawn in the main opinion in Y.M. is binding in this case, the juvenile court could and did accept reports written by the two DHR employees who authored several of the reports objected to by the mother's counsel. The testimony establishes that the court reports dated November 10, 1999, December 1, 1999, and January 7, 2000 (Hunter's reports), as well as February 22, 2001, and August 14, 2001 (Sanders's reports) were properly authenticated and admitted.
In addition to that admissible evidence, a trial court may take judicial notice of its own prior orders in a pending case. See 2 Charles W. Gamble, McElroy's Alabama Evidence § 484.02(2) (5th ed.1996); Richardson v. Richardson, 531 So.2d 1241 (Ala.Civ.App.1988). In this case, when the trial court stated that it would take judicial notice of its prior ordersrequiring the mother to submit to random drug testing, *407 to attend certain classes in parenting and anger management, and to pay child supportneither of the parent's attorneys objected, thereby waiving any objection on appeal. See Vaughan v. Oliver, 822 So.2d 1163, 1169 (Ala.2001).
Finally, it has long been the rule that any consideration of inadmissible written evidence constitutes harmless error whenever properly admitted testimony substantially duplicates the evidence contained in the inadmissible writings. See Rule 45, Ala. R.App. P.; Worley v. Jinks, 361 So.2d 1082 (Ala.Civ.App.1978); see also R.M. v. State Dep't of Human Res., 735 So.2d 1218 (Ala.Civ.App.1998) (Crawley, J., concurring specially). Thus, while the juvenile court may technically have erred in allowing certain DHR documents to be admitted, a number of the records and orders were properly admitted during the adjudicatory phase of the parental-rights-termination proceeding. Conversely, to determine whether the improper admission of certain other DHR reports was reversible error, we must review the juvenile court's judgment in light of the testimony and admissible evidence in order to ascertain whether the error in admitting certain records was harmless.
The November 10, 1999, report prepared by Hunter corroborated Hunter's testimony that the mother refused to enter a shelter because she did not believe a shelter was an appropriate environment for the child. Home evaluations had been performed on the father's cousin, and the mother's friend's home. The report concluded that although the court order allowed the mother to regain custody if she entered a domestic-violence shelter, the mother refused to do so; thus, the child remained in DHR custody in foster care. The report also noted that the mother "refuses to go to a Domestic Violence Shelter; [is] unable to provide a stable home environment for [the] child; [and] has not enrolled in the UAB TASC program for random drug screening." Hunter's December 1, 1999, report noted that the mother's parents had filed a petition seeking temporary custody of the child; however, a review of DHR records revealed that the mother's mother had previous allegations of abuse of her own children between 1978 and 1992. DHR recommended not placing the child with the mother's mother and keeping the child in foster care until the child could be reunited with her mother. The third report, dated January 7, 2000, prepared by Hunter, summarized the previous two reports and concluded that, although the mother still had not enrolled in a program for random drug screening, the "[w]orker believes th[e] child should remain in foster care until mother has stable housing, stable employment and is able to provide a safe home environment for the child."
The February 22, 2001, court report prepared by Sanders summarized the situation that led to DHR's gaining custody of the child in 1999, as outlined in Hunter's three reports. The report stated that the child "continues to do well in her current foster home, continues to visit with her mother and maternal grandparents every other Tuesday at DHR, and continues to attend daycare where she is able to learn and interact with children her own age." This report concluded for the first time that the case plan for the child was termination of parental rights and adoption of the child. Sanders prepared a court report dated August 14, 2001, in which the previous orders of the juvenile court were listed. Those orders required both parents to enroll in and successfully complete inpatient drug treatment, followed by aftercare with six months of random drug screening, to attend anger-management counseling and parenting classes until released *408 by counselors, to have supervised visits with the child at DHR, to cooperate with DHR and service providers, to locate stable housing and stable employment, and each to pay $147 in monthly child support. The report noted that on August 6, 2001, the child had been moved from foster care into an adoptive home. The report contained the statement that "[t]here is no new information to provide regarding [the mother's] compliance with the court orders." The report concluded that the case plan for the child was termination of parental rights and adoption.
This court has consistently held that, in a proceeding to terminate parental rights, the juvenile court must first find from clear and convincing evidence that the child is dependent. See S.F. v. Dep't of Human Res., 680 So.2d 346 (Ala.Civ. App.1996); K.M. v. Shelby County Dep't of Human Res., 628 So.2d 812 (Ala.Civ.App. 1993). Second, the juvenile court must determine that there exists no viable alternatives to terminating the parental rights. See P.W. v. Houston County Dep't of Human Res., 771 So.2d 1057 (Ala.Civ.App. 2000); L.A.G. v. State Dep't of Human Res., 681 So.2d 596 (Ala.Civ.App.1996). "Although a child's parents have a prima facie right to custody, the paramount concern in these proceedings is the best interests of the child." P.W., 771 So.2d at 1059. The principal statutes concerning actions to terminate parental rights are codified at §§ 26-18-1 through 26-18-11, Ala.Code 1975.
Section 26-18-7(a) provides, in pertinent part:
"If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child....
"(4) Conviction of and imprisonment for a felony.
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
"(6) That reasonable efforts by the [DHR] ... leading toward the rehabilitation of the parents have failed.
"....
"(8) That parental rights to a sibling of the child have been involuntarily terminated."
Furthermore, § 26-18-7(b) provides that if, at the time of the termination hearing, the child is not in the custody of the parents, the juvenile court may consider *409 whether the parents are providing monetary support for the child, whether they are regularly exercising visitation with the child, and whether they are adjusting their "circumstances to meet the needs of the child."
We first address whether the child is dependent. The admissible evidence indicated that the child was removed from the mother in September 1999, as a result of a violent argument between the mother and the father. The mother sought a protection-from-abuse order and eventually moved out of the abusive environment. The mother stated that she had left the father as a result of his violent behavior and in order to get her child back from DHR. However, the mother testified that she had never paid child support and had not maintained steady employment to enable her to make court-ordered child-support payments. The mother admitted that she had lived in numerous locations between September 1999 and August 2001 with friends, with her mother, with the parents of her boyfriend, and most recently with other relatives of her boyfriend. The mother's inability to maintain full-time employment and thereby acquire stable housing was evident from her own testimony. We conclude that the record contains clear and convincing evidence that the child is dependent.
We next review whether the juvenile court properly considered viable alternatives to a termination of the mother's parental rights and whether it properly rejected those alternatives. The current case worker, Sanders, confirmed that the mother had consistently exercised visitation during the eight months immediately preceding the trial. However, the mother admitted that she had never paid child support. She testified that because she had never gotten a driver's license nor owned a motor vehicle, she had not been able to maintain steady employment. She also stated that the lack of a means of reliable transportation had prevented her from following the previous court orders to attend an inpatient drug treatment program, to submit to random drug tests, and to take parenting and anger-management classes. The earliest reports prepared by Hunter, as well as the mother's testimony, established that none of the mother's relatives could be considered appropriate placements. Furthermore, none of the father's relatives had expressed an interest in being considered as alternate placements after 1999.
The juvenile court's judgment contained the following findings of fact regarding the mother:
"The mother has never completed drug assessments and random drug screens; has failed to maintain stable housing; has failed to adjust her circumstances in order to attend required services; has failed to attend parenting education; has provided no support for her child; [and] has failed to maintain employment....
"....
"Based on the foregoing, this Courts [sic] finds that the parents have failed to provide for their child when able to do so, to adjust their circumstances as required by the court, after offers of services from [DHR]...."
If this court completely ignores all the court reports and focuses solely on the testimony, the mother's own testimony established that she had done nothing until the week of trial to adjust her circumstances to meet the needs of her child. The mother had had numerous opportunities to change her living conditions in order to regain custody of her child between the time the child was taken into custody by DHR and the time of trial. Even though the mother testified that for nearly *410 a year she had had her own apartment and a steady job, at no time did she ever pay child support. Similarly, although the mother blames her inability to comply with court orders to undergo drug screening and attend parenting classes on her lack of transportation, that lack could have been easily remedied at any time if the mother had shown any initiative to change her circumstances and had moved to a location serviced by public transportation. The admissible evidence indicated that the mother loved the child, but also that she had taken no affirmative steps to modify her lifestyle to meet the needs of the child. We conclude that visiting with the child is insufficient by itself to meet the statutory requirements of § 28-18-7(b) to regain custody of the child.
The admissible evidence contained in the five reports summarized earlier, coupled with the mother's own testimony that she had never paid child support, had failed to undergo random drug screening, had never taken anger-management classes, and had never acquired stable housing or employment constitutes clear and convincing evidence to support the trial court's judgment terminating the mother's parental rights. "`"The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the child[]."'" J.W. v. State Dep't of Human Res., 855 So.2d 539, 543 (Ala.Civ.App.2003) (quoting A.R.E. v. E.S.W., 702 So.2d 138, 139 (Ala. Civ.App.1997), quoting in turn M.H.S. v. State Dep't of Human Res., 636 So.2d 419, 421 (Ala.Civ.App.1994)).
Based on the foregoing, we conclude that, although the juvenile court improperly admitted several DHR reports that should have been excluded on the grounds of hearsay, a careful review of the recordomitting those reportsreveals that admissible evidence supports the termination of the mother's parental rights. Any error in admitting the other court records was harmless in the light of the properly admitted evidence and testimony that support the judgment. See 2 McElroy's Alabama Evidence, § 430.01 (5th ed.1996); Muncher v. Muncher, 509 So.2d 250, 252 (Ala.Civ.App.1987). The judgment of the juvenile court is due to be affirmed.
AFFIRMED.
CRAWLEY, J., concurs specially.
YATES, P.J., and THOMPSON and MURDOCK, JJ., concur in the result.
CRAWLEY, Judge, concurring specially.
I concur with the main opinion's holding that if the trial court erred in this proceeding by admitting hearsay, the error was harmless. I write specially only to point out that, while a juvenile court may, of course, take notice of its own records, it may not "remove the documentary materials in the court files from the purview of the hearsay rule." Y.M. v. Jefferson County Dep't of Human Res., [Ms. 2010755, January 24, 2003] ___ So.2d ___, ___ (Ala.Civ.App.2003) (citing In re A.B., 308 Ill.App.3d 227, 719 N.E.2d 348, 241 Ill.Dec. 487 (1999)) (holding that the trial court erroneously took judicial notice, in a parental-rights-termination proceeding, of the entire neglect file that led to the removal of the children from the mother).
"`A court may take judicial notice of matters generally known to the court and not subject to reasonable dispute. This includes matters of record in its own proceedings. However, taking judicial notice of matters of record in a court's own proceedings cannot result in admitting hearsay evidence *411 where it would otherwise be prohibited.'

"In re A.B., 308 Ill.App.3d at 237, 719 N.E.2d at 356-57, 241 Ill.Dec. at 495-96 (citations omitted).
"`[D]uring a typical proceeding to terminate parental rights, a trial court will likely receive various service plans and reports that may contain information that is hearsay or otherwise inadmissible. Wholesale judicial notice of all matters occurring prior to the unfitness hearing is unnecessary and inappropriate, and a trial court should only take judicial notice of those portions of the underlying court files that have been proffered by the State and to which the respondent is given an opportunity to object.'

"In re J.P., 316 Ill.App.3d 652, 662-63, 737 N.E.2d 364, 372, 249 Ill.Dec. 974, 982 (2000) (citations omitted)."
Y.M., ___ So.2d at ___.
NOTES
[1] A review of those exhibits reveals that none of those reports were actually prepared by Sanders.