972 So.2d 89 (2007)
M.E.
v.
SHELBY COUNTY DEPARTMENT OF HUMAN RESOURCES.
2050806.
Court of Civil Appeals of Alabama.
May 4, 2007.
*92 James v. Green, Jr., Alabaster, for appellant.
Troy King, atty. gen., and Sharon E. Ficquette and Elizabeth Hendrix, asst. attys. gen., Department of Human Resources, for appellee.
MOORE, Judge.
This is a termination-of-parental-rights case. After an ore tenus proceeding held on December 7, 2005, the Shelby County Juvenile Court entered a judgment on April 19, 2006, terminating the parental rights of M.E. ("the mother") and S.E. ("the father") to Sh.E. and Ma.E. ("the children"). The mother moved to alter, amend, or vacate the judgment. After the trial court denied the postjudgment motion, the mother timely appealed. The mother argues that the State failed to present clear and convincing evidence justifying termination of her parental rights.

Standard of Review
In cases in which the State petitions for termination of parental rights, the State has the burden of showing that the parent is not capable or is unwilling to discharge his or her parental responsibilities and that there are no viable alternatives to terminating parental rights. Ex parte T.V., 971 So.2d 1, 4 (Ala.2007) (citing Ex parte Ogle, 516 So.2d 243, 247 (Ala. 1987), and K.W. v. J.G., 856 So.2d 859, 874 (Ala.Civ.App.2003)). "In order to terminate parental rights, the trial court must find by clear and convincing evidence that the child is dependent and that an alternative less drastic than termination of parental rights is not available. Ala.Code 1975, §§ 12-15-65(e), 26-18-1 to 26-18-10; Ex parte Beasley, 564 So.2d 950, 952 (Ala. 1990)." Ex parte T.V., 971 So.2d at 4. "`"[C]lear and convincing evidence" is "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction *93 as to each essential element of the claim and a high probability as to the correctness of the conclusion."'" Ex parte T.V., 971 So.2d at 9 (quoting L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002), in turn citing Ala.Code 1975, § 6-11-20(b)(4)).
When a trial court conducts ore tenus proceedings, its findings of fact will not be disturbed on appeal "`unless those findings are plainly and palpably wrong and not supported by the evidence.'" H.E.B. v. J.A.D., 909 So.2d 840, 842 (Ala. Civ.App.2005) (quoting Williams v. Lide, 628 So.2d 531, 534 (Ala.1993)). However, the ore tenus rule "`does not extend to cloak a trial judge's conclusions of law, or incorrect application of law to the facts.'" H.E.B., 909 So.2d at 842 (quoting Eubanks v. Hale, 752 So.2d 1113, 1144 (Ala.1999)). "`"The appellate courts do not sit in judgment of the facts, and [they] review the factfinder's determination of facts only to the extent of determining whether it is sufficiently supported by the evidence, that question being one of law."'" Ex parte T.V., 971 So.2d at 9 (quoting Hinds v. Hinds, 887 So.2d 267, 272-73 n. 2 (Ala.Civ. App.2003), quoting in turn Curtis White Constr. Co. v. Butts & Billingsley Constr. Co., 473 So.2d 1040, 1041 (Ala.1985)).
Therefore, when a parent raises on appeal a question as to the sufficiency of the evidence supporting a termination of his or her parental rights, we are required to determine whether clear and convincing evidence supports the trial court's findings of fact. Ex parte T.V., 971 So.2d at 7. This inquiry mandates that the appellate court affirm the judgment if, after a "careful search of the record," Moore v. State Dep't of Pensions & Sec., 470 So.2d 1269, 1270 (Ala.Civ.App.1985), it finds clear and convincing evidence supporting findings of dependency and an absence of viable alternatives less drastic than termination of parental rights. Columbus v. DHR, 523 So.2d 419, 421 (Ala.Civ.App.1987); see also L.M., 840 So.2d at 179 ("Due to the serious nature of the action of terminating a parent's parental rights, this court must carefully review the unique set of facts established in each case in determining whether clear and convincing evidence was presented to support the termination of those rights."). If not, we are compelled to reverse. See P.H. v. Madison County Dep't of Human Res., 937 So.2d 525 (Ala.Civ. App.2006); and B.G. v. State Dep't of Human Res., 875 So.2d 305, 309 (Ala.Civ.App. 2003).

History and Background
The mother and the father met in November 2000, when the mother was 21 years old; a month later, they began living together. The mother quickly discovered that the father used an excessive amount of alcohol and medication not prescribed to him. She informed the father that she would leave him if he did not stop. After the father quit drinking and taking drugs, the two married in Ohio.
Within a few months, the mother and the father engaged in a physical altercation in which the mother cut her hand. A neighbor alerted the police; the father was arrested and jailed, but he was never convicted of any offense. The parties reconciled afterwards with a mutual agreement that they would not physically harm one another.
Shortly after that incident, the mother became pregnant with twins. In June 2001, the mother and the father had another episode of domestic violence in which the father "tackled" the mother. According to the mother, because of this incident, the mother began to hemorrhage and lost one of the twins. The police again arrested the father, but he was never convicted of any crime.
*94 The mother and father separated for a brief amount of time, during which time the father was the subject of a "protection-from-abuse" order. However, the mother later reconciled with the father because, she stated, he had obtained counseling. The mother gave birth to Sh.E. on February 27, 2002, while the couple was reconciled.
After the birth of Sh.E., the mother testified, she discovered the father had resumed using illegal drugs and that he had been convicted of driving while impaired by marijuana. The mother also found drug paraphernalia, which, she said, indicated to her that the father was smoking crack cocaine. She also noted the father's erratic behavior, which suggested to her that he was again using drugs. Despite this evidence, the mother did not leave the father and she again became pregnant.
On February 1, 2003, the mother gave birth to Ma.E., who was born 13 weeks' premature. The father visited the mother in the hospital after the birth and pushed her while she was holding the newborn, causing security guards to escort the father from the hospital. Although the mother testified that she was concerned for the safety of her children, she and the children continued to live with the father in Kentucky after this incident.
In approximately April 2003, the mother and father engaged in another episode of domestic violence. As a result of an argument, the mother testified, the father dragged her through their home while the children were sleeping. She called the police and the father fled the house. The mother also contacted the London County Cabinet of Family Services (an agency in Kentucky equivalent to Alabama's Department of Human Resources) requesting protection and assistance.
The mother testified that she and the children moved out of the family residence after the April 2003 incident. According to the mother, she and the children lived on their own in Hazel Green, Kentucky, and the father moved in with his mother in Corbin, Kentucky. However, the mother and the father continued to talk because of the children. The mother also allowed the father weekend visitation with the children. The mother testified that, at times, she was concerned for the safety of her children because the father and his parents threatened to "kidnap" the children and the father would do things such as spit in her face. The mother testified that she had reported those threats and incidents to the police and that she had obtained a restraining order against the father.
The mother testified that after she obtained the restraining order, she decided to move on with her life. She began dating another man and she became pregnant by him. While she was pregnant, the father came to the home she shared with the children and physically assaulted her, causing her to miscarry the unborn child. Again, the father was not convicted of any crime for this assault described by the mother.
Despite the recurring incidents of domestic violence, the mother and father reconciled briefly at the end of 2003. As a result, the mother became pregnant with the father's child. She referred to this unborn child as "Evan." When the mother was 27 weeks pregnant with Evan, the father again assaulted the mother, which, according to the mother, caused her to miscarry the unborn child. The father was eventually convicted of domestic violence as a result of this attack. However, before his conviction, the mother continued to live with the father. She testified that she stayed with the father in order to raise enough money to leave him.
*95 On March 23, 2004, the mother moved with the children to Montevallo, Alabama, to live with her great-aunt, C.D. The mother testified that she moved to Alabama to escape the recurring domestic violence perpetrated against her. However, the father came with the mother and the children. The mother testified that the father simply drove her and the children to Alabama because the couple owned only one car and that she had intended that the father would leave once she and the children had safely settled in her great-aunt's home.
Less than a month after arriving in Alabama, on April 19, 2004, the Shelby County Department of Human Resources ("DHR") received a Child Abuse and Neglect Report regarding the children that had been filed by Children's Services in Ohio. The report detailed the mother and father's extensive domestic-violence history, as well as the involvement of child-protective services in Ohio and Kentucky. DHR learned that the Adams County, Ohio, Children's Services had obtained temporary protective supervision of the children in January 2004 and that a court hearing had been scheduled in the matter for April 16, 2004, but that, before the hearing could take place, the mother reported to Adams County officials that she was taking the children to Montevallo.
On April 20, 2004, DHR filed dependency petitions regarding the children. In support of those petitions, DHR asserted that the children were at risk of harm because of their unmet medical needs, domestic violence between the parents, physical abuse by the father, and the mother's mental instability.
In support of its dependency petitions, DHR asserted that the mother had misled DHR by stating that the father had left Alabama on March 26, 2004, three days after she, the children, and the father had arrived in Montevallo. However, DHR asserted that the father was, in fact, living with the mother and the children in C.D.'s home and that the father was employed in Montevallo. Both the mother and the father denied that the father continued to live with the mother and the children, but the mother did admit that she had met the father once in Alabama after the date she testified he had left the state to receive money and diapers.
At the April, 20, 2004, shelter-care hearing, the juvenile court ordered the children to be taken into immediate custody by DHR. At the time of the initial shelter-care hearing, Sh.E. was approximately 26 months old and Ma.E. was 14 months old.
On May 21, 2004, the juvenile court conducted another hearing; at this hearing, the juvenile court ordered that DHR retain custody of the minor children. In the juvenile court's May 21, 2004, order, the court ordered the mother and the father to submit to psychological and substance-abuse assessments, to undergo domestic-violence counseling, and to attend anger-management classes.
Not long after this hearing, the mother allowed the father to stay with her for a few weeks. The mother testified that she had allowed the father to move back in with her so that he could stabilize himself and so that he could get their children back. However, the mother and father soon engaged in another episode of domestic violence. The mother fled the motel where they were staying and sought the protection of a neighbor. Subsequently, she obtained a protection-from-abuse order preventing the father from having any contact with her and the children. The father was arrested as a result of this incident.
At a meeting in July 2004, the mother notified DHR that she was engaged to *96 another man, C.C. In connection with this meeting, the mother made various statements that caused DHR concern as to her mental stability.
In August 2004, "Family Options" began working with the mother. According to DHR, Family Options is a short-term service designed to assess parenting skills and to identify services that might alleviate the deficiencies found. Family Options recommended that the mother's visits continue to be supervised and that "Wraparound" services be implemented for the mother.
In September 2004, "Wraparound" began providing family services to the mother. According to DHR, "Wraparound" is "a team of services that involve social workers and case aids, [and] therapists, and they kind of wrap themselves around a family. They do parenting training. They do therapy. They do just general kind of child development stuff." According to the DHR worker who testified at trial, the mother completed an anger-management program, obtaining a certificate of completion. However, Wraparound later recommended that the mother attend another anger-management program but the mother refused, stating that she had already completed the program.
On March 9, 2005, the mother obtained a divorce from the father. She later married C.C.
On March 17, 2005, the juvenile court conducted another hearing, concluding that the children were dependent and that they should remain in the custody of DHR. The court awarded both parents visitation, subject to the recommendation of the children's therapist and subject to the requirement that the visitation be supervised by DHR or its designee. Although she received notice of the hearing, the mother did not attend. She did receive a copy of the juvenile court's order.
In a report made to the juvenile court in connection with the dependency hearing, DHR reported that the mother had undergone a psychological evaluation and that, following that evaluation, the psychologist recommended that
"[the mother]'s visits with the children remain supervised until [the mother] could `learn to establish a safe and healthy environment for herself and her children'; that [the mother] participate in a psychiatric evaluation; that [the mother] participate in a domestic violence program; that [the mother] participate in an anger management program; that [the mother] complete parenting training; and that [the mother] participate in individual therapy."
DHR also noted in this report that the mother had tested positive for drugs "more and more frequently. [The mother] seems to have an excessive amount of accidents requiring pain medication." However, there is no indication that the mother ever tested positive for illegal drugs or that the mother was using prescription medications for which she had no prescription.
On March 22, 2005, the mother formally filed a petition for custody of her children with the juvenile court. She asserted that she was a fit person to have custody, that it would be in the best interests of the children that they be placed with her, that the circumstances that necessitated the children's removal from her custody no longer existed, and that she had complied with all of DHR's requests. On that same date, the mother petitioned for expanded and unsupervised visitation with the children.
In April 2005, a psychiatrist evaluated the mother at the request of DHR. Although the psychiatrist's report is not in the record, the DHR representative testified *97 that the mother had been diagnosed with a borderline personality disorder and post-traumatic stress syndrome. The record does not contain the recommendations of the psychiatrist other than stating that the psychiatrist had not prescribed any medication to the mother.
DHR also reported that it had opened another case file involving the mother's third child, K.C., her child by C.C., because of reports of repeated incidents of domestic violence between the mother and C.C.
In May 2005, a representative of Wraparound indicated that the mother had made minimal progress during her eight-month treatment. The representative of Wraparound stated:
"[I]t is our opinion that the [the mother] has maximized wraparound services. Services provided to [the mother] included parenting and supervised visitations. During the past eight months of service we have seen minimal progress with [the mother]. Due to concerns over [the mother]'s inability to control her behavior when angry, we have not been able to proceed with services in the home. [The mother] has been resistant to recommendations for further anger management services through expanded counseling and/or the GVIP intervention group. [The mother] has been observed to have continual instability in her life including her housing, employment, and relationships with men. [The mother] has been unwilling to accept responsibility for the decisions she has made concerning her children and places blame on someone else when things go wrong. [The mother] did complete 1-2-3 Magic in parenting but has not shown the ability to appropriately apply it with her children. Effective Friday, May 27, 2005, services with the client's mother will be terminated."
On September 6, 2005, DHR petitioned the juvenile court to terminate the parental rights of the mother and the father. In support of DHR's petitions against the mother, DHR alleged that the mother had substance-abuse issues, had failed to seek and cooperate with treatment, had refused to cooperate with recommendations placed on her as a result of her psychological evaluation, had failed to establish a safe and stable environment for herself and her children, and had failed to provide for the material needs of the children. DHR asserted that both the mother and the father were unable or unwilling to adjust their circumstances to meet the needs of their children and that those conditions were unlikely to change in the foreseeable future, that DHR had engaged in reasonable efforts to rehabilitate the mother but that such efforts had failed, and that suitable alternative relative resources for placement of the children were not available.
The juvenile court scheduled a hearing on DHR's termination petitions for November 14, 2005. Immediately before this hearing, C.D., the mother's great-aunt, and certain family members of the father, who were located in Kentucky, notified the juvenile court that they desired custody of the children. The juvenile court granted a continuance of the hearing for the purpose of obtaining a home study of C.D., but not of the father's relatives because DHR had indicated that all efforts to obtain home studies in Kentucky had been thwarted by the relatives.
The juvenile court held an adjudicatory hearing on December 7, 2005, at which the mother, the father, the mother's great-aunt, and Ali Payne, a DHR representative, testified.
The mother testified that she was currently incarcerated at the Shelby County jail for domestic violence against C.C. She testified that she had moved to SafeHouse, *98 a domestic-violence shelter, before going to jail and that she planned to return there upon her release. She further testified that she was always the victim and not the instigator of the domestic violence between her and the father; however, she admitted that she had been convicted of filing a false accusation of domestic violence against the father.
The father admitted abusing the mother and being convicted three times of drug-related offenses and twice of domestic abuse in Ohio and Kentucky, respectively. He also acknowledged that the mother had obtained a protection-from-abuse order against him in Alabama. However, he stated that the mother had often instigated the violence and had lied to juvenile and law-enforcement authorities about it. He further testified that he did not believe the mother to be a proper custodian of the children because, he said, she occasionally used illegal drugs and alcohol, which caused "mood swings," and she was mentally unstable. The father consented to the termination of his parental rights.
C.D., the mother's maternal great-aunt, admitted that she had pleaded no contest to possession of marijuana and possession of a controlled substance in 2005. She also admitted that she and her former husband had been investigated by the Bibb County DHR for allegations of sexual abuse against children in their custody but that the children were not removed. C.D. testified that she was working two jobs and that she reserved all of her available time for her children. She denied using drugs with the mother, and she testified that she had passed every drug screen required by her employer.
Ali Payne, the DHR worker assigned to the case since April 2004, testified regarding the services that DHR had made available to the mother since that time. Payne admitted that Family Options was never expected to cure any of the problems existing in the mother's home; she testified that Family Options simply made recommendations as to what services were needed in any given home. Additionally, Payne testified that she was not personally involved in any of the services provided to the mother through the Wraparound program; she acknowledged that her only involvement with Wraparound was to review reports from that entity regarding its contact with the mother.
Although DHR's petitions to terminate the mother's parental rights indicated that the mother had drug-abuse issues, Payne acknowledged that the mother had completed all the services to which DHR had referred the mother for "drug assessments"; Payne also acknowledged that DHR had not obtained a "confirmed" drug screen from the mother. Payne also admitted that the mother had no known problems with alcohol abuse, other than the fact that the mother herself had admitted to drinking beer. Payne acknowledged that the mother's third child, K.C., had been born healthy. Despite this testimony, Payne testified that there were "some suspicions" that the mother was abusing alcohol.
Moreover, Payne initially admitted that the mother had complied with all of DHR's requests for psychological and psychiatric evaluations and treatment, but she later clarified that the mother had missed some therapy appointments, which the mother conceded. Payne acknowledged that DHR had requested the mother to attend an anger-management program and that the mother, in fact, had obtained a certificate of completion from that program. However, Payne pointed out that DHR had requested the mother to attend the anger-management program for a second time but that the mother had declined to do so, asserting that she had already successfully *99 completed the anger-management program. Although Payne pointed to this refusal as a failure to comply with DHR's requirements, Payne admitted that she was not surprised that the mother was opposed to attending the same anger-management program for a second time.
Despite her testimony that the mother had complied with substantially all of DHR's requests, Payne testified that DHR did not consider the mother to have successfully completed the necessary steps to regain custody of her children. Payne testified that DHR had concluded that the mother was not capable of providing a suitable and fit home for the children. According to Payne, the mother had made no improvement in her behavior despite all of the services provided to the mother.
Payne testified that she did not consider the mother to have completed the programs successfully because the services provided to the mother were intended "to prevent her from making bad choices again" and to assist the mother in "identify[ing] domestic violence and [the] characteristics to look for." Payne testified that despite the services provided to the mother, the mother continued to make bad choices in her personal relationships.
Conversely, Payne acknowledged that "there may have been something else that we could have done [to help the mother]"; she stated: "I've thought all along that there's something more to do." However, Payne testified that she was uncertain if DHR or anyone else could teach the mother how to make healthy decisions; Payne admitted that she herself did not know how to break the pattern of repeatedly entering into abusive relationships.
Despite Payne's conclusion that the mother could not provide an appropriate home for the children, Payne acknowledged that the mother loved her children, that throughout DHR's involvement in this case the mother had regularly visited her children, that the mother had maintained regular contact with her children, and that Payne had observed the mother expressing her parental love and affection with her children.
Payne also testified that DHR could not recommend C.D. as an appropriate relative placement for the children because of C.D.'s previous drug convictions and because of her 1995 involvement with the Bibb County DHR. However, Payne admitted that she had not investigated the 1995 DHR report regarding C.D.; Payne also admitted that she had no details of C.D.'s drug convictions.
Payne also testified that, before the mother's arrest in December 2005, the mother had sought the assistance of DHR in connection with a domestic-violence incident involving C.C. According to Payne, the mother had indicated at this meeting that she still loved the father and that she and the father had made plans for him to obtain custody of their children, to return to Kentucky with the children, and for the mother to join them there, where they would all reconcile. According to Payne, the mother made those statements only a few days before the termination hearing. Both the mother and the father denied any planned reunion.

Analysis
In Ex parte T.V. the Alabama Supreme Court stated:
"When deciding whether to terminate parental rights, `the primary focus of a court . . . is to protect the welfare of children and at the same time to protect the rights of their parents.' Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). Thus, `a court should terminate parental rights only in the most egregious of circumstances.' Id. Beasley set forth a two-pronged test that must be applied in *100 terminating an individual's parental rights. First, unless the petitioner is a parent of the child, the court must make a `finding of dependency.' 564 So.2d at 954. For a finding of dependency, the court must consider whether there are grounds for terminating the parental rights, including but not limited to the grounds specified in § 26-18-7. 564 So.2d at 954. After making a finding of dependency, the court must ensure that `all viable alternatives to a termination of parental rights have been considered.' 564 So.2d at 954.
"`Once the court has complied with this two-prong test  that is, once it has determined that the petitioner has met the statutory burden of proof and that, having considered and rejected other alternatives, a termination of parental rights is in the best interest of the child  it can order the termination of parental rights.'
"564 So.2d at 954-55."
Ex parte T.V., 971 So.2d at 4-5 (footnote omitted).
Therefore, we first consider whether clear and convincing evidence supports a finding of dependency. For a finding of dependency, the court must determine that there are grounds for terminating parental rights. Ex parte T.V., 971 So.2d at 4. Ala.Code 1975, § 26-18-7(a), states, in pertinent part:
"If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents."
This section further provides that in cases in which it is alleged that the parent is unable or unwilling to discharge their responsibilities for the child the trial court must consider, among other things:
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
". . . .
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed."
Further, Ala.Code 1975, § 26-18-7(b), states, in pertinent part:
"Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
". . . .
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
Although § 26-18-7 lists many of the factors a trial court must consider in deciding whether a child is dependent, those statutory factors are not exclusive. See Ex parte Beasley, 564 So.2d at 954. The trial court may consider any competent evidence relevant to the ability or willingness of the parent to discharge his or her responsibilities to the child, including, but not limited to, evidence of: domestic violence, see, e.g., A.W.G. v. Jefferson County Dep't of Human Res., 861 So.2d 400 (Ala. *101 Civ.App.2003), and B.D.S. v. Calhoun County Dep't of Human Res., 881 So.2d 1042 (Ala.Civ.App.2003); parental conduct toward other children, see, e.g., D.A. v. Calhoun County Dep't of Human Res., 892 So.2d 963 (Ala.Civ.App.2004); dangerous parental associations, see, e.g., D.M.P. v. State Dep't of Human Res., 871 So.2d 77 (Ala.Civ.App.2003), and C.W. v. State Dep't of Human Res., 826 So.2d 171 (Ala.Civ. App.2002); an unreasonable failure to appear at hearings affecting parental rights, see, e.g., State Dep't of Human Res. v. A.K., 851 So.2d 1 (Ala.Civ.App.2002); the parent's incarceration, see J.L. v. State Dep't of Human Res., 961 So.2d 839 (Ala. Civ.App.2007); the parent's homelessness, see, e.g., State Dep't of Human Res. v. A.K., supra; the opinion testimony of family members, A.R.E. v. E.S.W., 702 So.2d 138 (Ala.Civ.App.1997); and the parent's lack of steady employment, see, e.g., Q.F. v. Madison County Dep't of Human Res., 891 So.2d 330 (Ala.Civ.App.2004).
When determining whether clear and convincing evidence supports grounds for termination of parental rights, the trial court is required to consider not only the parent's past attitude and conduct, but also the parent's current conditions. See D.O. v. Calhoun County Dep't of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003) ("This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.").
In this case, the record contains clear and convincing evidence indicating that the mother was unable or unwilling to discharge her parental responsibilities to her children. The evidence of past conditions indicates that the mother routinely engages in physically abusive relationships. According to the mother's own testimony, these relationships have resulted in the death of her unborn children. The domestic violence, whether perpetrated against her or instigated by her, has also endangered the living children, resulting in lengthy and repeated need for child-protective services from at least two states.
The evidence of present conditions indicates that at the time of the hearing in this matter the mother was incarcerated for domestic violence, was jobless, and was homeless. She was married to C.C., but she had left him because of the domestic violence. Although she completed substantially all of the services provided by DHR, she still made bad choices regarding her relationships that led to repeated episodes of domestic violence. Although she blames the father for the death of three unborn children, the mother maintains that she still loves the father. The record clearly and convincingly shows that the mother is unable to break out of her domestic-violence cycle despite the reasonable efforts of DHR and herself. The record is clear that this domestic-violence problem has endangered the children and has rendered the mother unable to discharge her basic responsibility to the children to protect them from the threat of physical or emotional harm.
We next address whether DHR considered all viable alternatives to the termination of the mother's parental rights. In Ex parte T.V., the Supreme Court stated that "[a] finding of dependency alone will not allow a trial court to terminate a parent's rights to his or her child; the trial court also must find by clear and convincing evidence that there are no viable alternatives to the termination of parental rights." 971 So.2d at 7. The legal requirement that the trial court must make a finding that there is no less-drastic viable alternative to termination of *102 parental rights flows not from the express language of § 26-18-7, but from federal due-process concerns. See D.M.P. v. State Dep't of Human Res., 871 So.2d 77 (Ala. Civ.App.2003).
The United States Supreme Court has long recognized that a parent has a fundamental right to the custody, care, and control of his or her child and that a parent and a child share a fundamental right to family integrity. See Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). These rights are accorded strong constitutional protection against State interference. Roe v. Conn, 417 F.Supp. 769, 779-80 (M.D.Ala.1976). In Conn, the Court, in considering the constitutionality of Alabama's then-existing child-neglect statute, stated:
"The State's interest . . . would become `compelling' enough to sever entirely the parent-child relationship only when the child is subjected to real physical and emotional harm and less drastic measures would be unavailing."
417 F.Supp. at 779 (emphasis added). Although Alabama has never accepted that termination of parental rights is an appropriate remedy only in cases involving real physical or emotional harm, it has incorporated the less-drastic-alternative analysis from Conn into its termination-of-parental-rights jurisprudence. See Miller v. Alabama Dep't of Pensions & Sec., 374 So.2d 1370 (Ala.Civ.App.1979).
This court and our Supreme Court have repeatedly recognized that termination of parental rights is a drastic measure and that it is the last and most extreme disposition afforded under the statute. See Ex parte T.V., 971 So.2d at 10; V.M. v. State Dep't of Human Res., 710 So.2d 915, 921 (Ala.Civ.App.1998) ("This court fully recognizes the difficulty of such cases as this. Nevertheless, the termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated."); and East v. Meadows, 529 So.2d 1010, 1012 (Ala.Civ. App.1988). Other state courts have characterized termination of parental rights as the "civil death penalty." See Tammila G. v. Nevada, ___ Nev. ___, 148 P.3d 759 (2006); In re K.A.W., 133 S.W.3d 1 (Mo. 2004); and Stann v. Levine, 180 N.C.App. 1, 636 S.E.2d 214 (2006). Hence, Alabama reserves termination of parental rights only for the most egregious cases in which less drastic alternatives are unavailable. K.W. v. J.G., 856 So.2d 859 (Ala.Civ.App. 2003).
Pursuant to Ala.Code 1975, § 12-15-1.1, it is an overriding goal of the juvenile laws to reunify a child with his or her parent as quickly and safely as possible. This goal is to be achieved in all cases in the least restrictive setting necessary, with a preference at all times for the preservation of the family and the integration of parental accountability and participation in treatment and counseling programs. Ala.Code 1975, § 12-15-1.1(8). Subsection 26-18-7(a)(6) places an affirmative duty on DHR to make reasonable efforts to rehabilitate the parent for the purposes of reunifying the family. See W.M.B. v. Mobile County Dep't of Human Res., 831 So.2d 46 (Ala. Civ.App.2002). Subsection 26-18-7(b)(4) likewise places an affirmative duty on the part of the parent to make reasonable efforts to rehabilitate himself or herself for the purposes of reunifying with the family.
As these statutes recognize, one less drastic viable alternative to termination of parental rights is rehabilitation to remove the circumstances, conditions, or conduct that caused the parent's inability or unwillingness to properly care for the child. See D.M.P. v. State Dep't of Human Res., 871 So.2d 77 (Ala.Civ.App.2003). However, once DHR and the parent have made reasonable efforts at rehabilitation, *103 and the conditions, circumstances, or conduct persists or relapse is likely, i.e., the parent is irremediably unfit, the trial court may properly find that rehabilitation and reunification is no longer a viable alternative. See, e.g., J.D. v. Tuscaloosa County Dep't of Human Res., 923 So.2d 303 (Ala. Civ.App.2005).
In this case, DHR tailored a rehabilitation plan to the particular problem that rendered the mother unable to properly care for her children. DHR designed and implemented a program to help the mother identify the risk factors for domestic violence and avoid those situations. DHR further offered the mother anger-management classes and Wraparound services to assist her in rehabilitating. The mother substantially complied with all of DHR's requests, but she showed no real change. During and after completion of the programs, the mother still engaged in domestic violence; in fact, she was incarcerated for domestic violence at the time of the hearing in this matter. DHR requested that the mother repeat the anger-management class, but she refused. Clear and convincing evidence contained in the record shows that rehabilitation failed and that further efforts at rehabilitation would be futile.
Although it appears that the mother may never rehabilitate to the point that she can reunify with her children, termination of parental rights is not the only potential alternative. Placement with third parties, such as willing and suitable relatives, see Ex parte J.R., 896 So.2d 416 (Ala.2004), foster parents, but see R.L.B. v. Morgan County Dep't of Human Res., 805 So.2d 721 (Ala.Civ.App.2001) (asserting that foster care is not a viable alternative when there is no opportunity for rehabilitation and reunification), or group homes, see State Dep't of Human Res. v. A.K., 851 So.2d 1 (Ala.Civ.App.2002), with varying degrees of parental visitation rights, may be a reasonable and less drastic alternative to termination of parental rights. In this case, the juvenile court considered and rejected placement with C.D. based on evidence indicating that C.D. was not a suitable placement. That evidence consisted of a prior investigation of C.D. for child endangerment, which concluded in no action being taken against C.D., and prior convictions involving illegal drugs. Although it appears that the mere investigation of the great-aunt by the Bibb County DHR would not be sufficient to find her unsuitable, this court has previously affirmed judgments finding that a relative is unsuitable for placement because of prior illegal-drug activity and criminal convictions. See, e.g., A.A. v. Cleburne County Dep't of Human Res., 912 So.2d 261 (Ala. Civ.App.2005).
The juvenile court also considered placement with the father's relatives. The record indicates that one of the relatives withdrew a petition for consideration of placement. The other relatives did not cooperate with efforts to obtain home studies to verify their suitability. Although DHR has a duty to investigate all potential relative placements, Ex parte J.R., 896 So.2d 416 (Ala.2004), if the relative obstructs those efforts, the trial court will not be placed in error for finding the relative unwilling to serve as a placement opportunity for the children. See M.W. v. Houston County Dep't of Human Res., 773 So.2d 484 (Ala.Civ.App.2000).
Neither the mother nor the father identified any other potential relatives or any other person who could take custody of the children. See B.S. v. Cullman County Dep't of Human Res., 865 So.2d 1188 (Ala. Civ.App.2003) (noting that parents have a duty to identify placement opportunities, which do not have to be relatives, and to notify DHR of same).
*104 In Ex parte T.V., 971 So.2d at, 8, the Supreme Court held that maintenance of the status quo, with foster parents maintaining custody while the mother visited and a bond grew between the mother and child, could be considered a viable alternative. In T.V., however, the evidence indicated that the mother had substantially rehabilitated to the point that her conduct and circumstances no longer posed a threat to the safety or welfare of the children. To the contrary, in the present case, the evidence shows that the mother has not rehabilitated and continues to engage in the conduct that endangered the children in the first place. The juvenile court could have properly decided that maintaining the status quo was not an acceptable alternative in this case.
The testimony at trial reveals that the mother loves her children. However, her love for the children has not been enough to motivate her to overcome her anger and other problems that contribute to her recurring episodes of domestic violence. See M.H. v. Calhoun County Dep't of Human Res., 848 So.2d 1011, 1016 (Ala. Civ.App.2002) (love of children is not sufficient to prevent termination of parental rights when mother would not stop abusing drugs and alcohol). The best interests of the children is the polestar in determining the availability of less drastic alternatives to termination of parental rights. D.M.P. v. State Dep't of Human Res., 871 So.2d at 94 (citing Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). In this case, clear and convincing evidence supports the juvenile court's finding that it would not be in the best interests of the children to continue in the custody of DHR with no hope of reconciliation with a fit parent. At the time of the entry of the judgment terminating the mother's parental rights, the children had been in the custody of DHR for almost two years. Currently, they are now four and three years old, respectively. They have been under the protection of state-run child-services agencies basically their entire lives. They need stability in their lives. They deserve proper care by a proper parent in a proper home. Termination of the mother's parental rights is the only viable method of serving those interests.
AFFIRMED.
BRYAN, J., concurs.
THOMPSON, P.J., and PITTMAN, J., concur in the result, without writings.
THOMAS, J., concurs in the result, with writing.
THOMAS, Judge, concurring in the result.
I concur in the result reached by the main opinion. I write separately, however, to address the main opinion's reliance on Ex parte T.V., 971 So.2d 1 (Ala.2007), and the main opinion's discussion of "maintenance of the status quo" as a "viable alternative" to the termination of parental rights  both of which, I believe, are unnecessary to the decision in this case and potentially misleading.
First, I believe that the main opinion's reliance on T.V. for any proposition relating to "viable alternatives" is incorrect. A court does not consider viable alternatives until it has first determined that grounds for termination exist. See Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990) (stating that "after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered" (emphasis added)); D.M.P. v. State Dep't of Human Res., 871 So.2d 77, 92 (Ala.Civ.App.2003) (plurality opinion) *105 (stating that "where it is demonstrated that the parents are not capable of being rehabilitated or that the `conduct or condition' of the parents that makes them unfit to regain custody of their children `is unlikely to change in the foreseeable future' . . ., obviously no alternative can be considered viable to the end of returning the child to a normal custodial relationship with his or her parent").
In T.V., the mother was a formerly unemployed, homeless, crack cocaine addict who, arguably, had abandoned her child before the trial of DHR's termination-of-parental-rights petition. DHR had had grounds to terminate the mother's parental rights four years earlier, but it had declined to do so because the mother had agreed with DHR to a permanent placement of the child with a person that, DHR thought, was a relative. By the time the termination petition was heard, the mother had completely turned her life around. She had not only conquered her drug addiction but had also begun to counsel others to avoid drugs; she was married, gainfully employed, and active in her church. The supreme court reiterated prior holdings of this court that
"`the existence of evidence of current conditions or conduct relating to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.'"
T.V., 971 So.2d at 5 (quoting D.O. v. Calhoun County Dep't of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003)). Because in T.V. the mother's current conditions or conduct did not support a finding that she was unable or unwilling to discharge her parental responsibilities to the child, T.V. is best understood as a case in which there were no grounds for termination rather than as a case in which there was a viable alternative to termination. The court's discussion of "viable alternatives" is best read as a commentary on the proper disposition of the child, given the fact that the court reversed the judgment terminating the mother's rights but assumed there would have to be a phase-in period to allow the mother and the child to become reacquainted before a change in actual physical custody would be in the child's best interests.
Because T.V. is not a true "viable alternatives" case, I think the main opinion's reliance on it for the proposition that proof of grounds for termination alone "`will not allow a trial court to terminate a parent's rights to his or her child; the trial court also must find by clear and convincing evidence that there are no viable alternatives to the termination of parental rights,'" 972 So.2d at 101, and for the proposition that once grounds for termination exist, "maintenance of the status quo" is a viable alternative, is incorrect and misleading. 972 So.2d at 104.
In the present case, the juvenile court determined that DHR had proved, by clear and convincing evidence, the grounds for termination of the mother's rights. The main opinion affirms that determination, which is the equivalent of holding that "the conduct or condition of the [mother] is such as to render [her] unable to properly care for the child[ren]" and that the mother's "conduct or condition is unlikely to change in the foreseeable future" or, in other words, that the mother is "irremediably unfit." See § 26-18-7(a), Ala.Code 1975. See also D.M.P. v. State Dep't of Human Res., supra.
The requirement that the juvenile court determine that a parent's "conduct or condition is unlikely to change in the foreseeable future" necessarily requires the court to make predictions about the future. However, the juvenile court is not without *106 the tools to make such a prediction, because that court has heard ore tenus evidence about the parent's past history and may logically conclude that past behavior is the most accurate predictor of future behavior. See Linkous v. Kingery, 10 Va. App. 45, 56, 390 S.E.2d 188, 194 (1990) (stating that "past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold").
The past behavior of the mother in this case provided no basis on which the juvenile court could have found that the mother's conduct or condition was likely to change in the foreseeable future. DHR presented clear and convincing evidence that the mother had made no progress toward rehabilitation despite having received an array of services tailored to her specific needs. Therefore, the juvenile court could conclude not only that the mother was "unable or unwilling to discharge [her] responsibilities to and for the child[ren]," but also that the mother was "unlikely to change in the foreseeable future," and, therefore, that "no alternative [could] be considered viable to the end of returning the child[ren] to a normal custodial relationship with [their mother]," D.M.P. v. State Dep't of Human Res., 871 So.2d at 92.