Rel: April 7, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2022-2023

_____

### CL-2022-0917

_____

### K.H.

### v.

### Madison County Department of Human Resources

### Appeal from Madison Juvenile Court
### (JU-20-671.01)

_____

### CL-2022-0918

_____

### K.H.

### v.

### Madison County Department of Human Resources

CL-2022-0917, CL-2022-0918, CL-2022-0919, and CL-2022-0920

**Appeal from Madison Juvenile Court**
**(JU-20-671.02)**

_____

**CL-2022-0919**
_____

**K.H.**

**v.**

**Madison County Department of Human Resources**

**Appeal from Madison Juvenile Court**
**(JU-20-672.01)**

_____

**CL-2022-0920**
_____

**K.H.**

**v.**

**Madison County Department of Human Resources**

**Appeal from Madison Juvenile Court**
**(JU-20-672.02)**

THOMPSON, Presiding Judge.

Two children, C.I., born in May 2011, and M.H., born in August 2020, were born of the relationship of K.H. ("the mother") and D.I. ("the

father").[1] When M.H. was born, that child tested positive for opiates. As a result, in September 2020, the Morgan County Department of Human Resources ("Morgan County DHR") filed in the Morgan Juvenile Court petitions seeking to have C.I. and M.H. ("the children") declared dependent. The Morgan Juvenile Court issued a pick-up order on September 2, 2020, and, also on that date, it ordered that the actions be transferred to the Madison Juvenile Court ("the juvenile court"), which it had determined was the proper venue for the dependency actions. The juvenile court assigned case number JU-20-671.01 to the dependency action concerning C.I. and case number JU-20-672.01 to the dependency action concerning M.H.; we refer to those two actions together as "the dependency actions." The children were placed in the custody of the Madison County Department of Human Resources ("DHR").

On November 4, 2020, the juvenile court entered orders in the dependency actions finding the children dependent and leaving the children in the custody of DHR. Additional orders making similar findings were entered during the pendency of the dependency actions. On

---

[1]The record does not explain why C.I. and M.H. have different last names.

May 5, 2021, the juvenile court entered orders continuing the award of custody of the children to DHR and ordering that the mother's visitation with the children be suspended because of her continued failure to comply with DHR's reunification efforts and services. Subsequent orders entered in the dependency actions continued the suspension of the mother's visitation rights.

On September 16, 2021, DHR filed in the juvenile court petitions seeking to terminate the parental rights of the mother and the father. The juvenile court assigned case number JU-20-671.02 to the termination-of-parental-rights action pertaining to C.I. and case number JU-20-672.02 to the termination-of-parental-rights action pertaining to M.H. The juvenile court accepted ore tenus evidence at a hearing on the termination-of-parental-rights petitions over the course of two days, July 14, 2022, and August 2, 2022. On August 15, 2022, the juvenile court entered judgments in the termination-of-parental rights actions in which it ordered that the parental rights of the mother and the father be terminated.

The mother filed notices of appeal in each of the dependency actions and from each of the August 15, 2022, judgments entered in the

CL-2022-0917, CL-2022-0918, CL-2022-0919, and CL-2022-0920

termination-of-parental-rights actions. This court's clerk assigned appeal number CL-2022-0917 to the mother's appeal in juvenile-court case number JU-20-671.01, and appeal number CL-2022-0919 to the mother's appeal in juvenile-court case number JU-20-672.01; those two appeals pertain to the dependency actions. This court assigned appeal number CL-2022-0918 to the mother's appeal of the judgment entered in juvenile-court case number JU-20-671.02, and appeal number CL-2022-0920 to the mother's appeal of the judgment entered in juvenile-court case number JU-20-672.02; those appeals concern the August 15, 2022, termination-of-parental-rights judgments.

The father did not participate in reunification services offered by DHR, and he did not take part in the dependency actions or the termination-of-parental-rights actions. The father did not appeal the judgments terminating his parental rights. Therefore, this opinion discusses facts pertaining to the father to the extent that they might be relevant to the arguments asserted by the mother in her appeals.

The record reveals the following pertinent facts. After having rescheduled the termination-of-parental-rights hearing once before, the juvenile court, on May 11, 2022, again entered an order rescheduling that

hearing for July 14, 2022. The mother did not appear at the hearing on July 14, 2022. Instead, at the beginning of the hearing, the mother addressed the juvenile court via Zoom, a videoconferencing service, and asked that she be allowed to participate in the termination-of-parental-rights hearing via Zoom because, she said, she had contracted the COVID-19 virus. On questioning by the juvenile court, the mother, who was not sworn in as a witness, represented to the juvenile court that she had tested positive for the COVID-19 virus one week earlier, although she admitted that she was experiencing no symptoms of that virus. The juvenile court expressed its concern that if the mother did not attend the hearing in person, she would be prevented from assisting and consulting with her attorney, who was present in the courtroom, during the hearing. The juvenile court informed the mother that it would allow her to participate in the termination-of-parental-rights hearing via Zoom until a break was taken to the portion of the hearing held on July 14, 2022 (i.e., the first day of the termination-of-parental-rights hearing). The juvenile court instructed the mother that, during the lunch break, the mother was expected to provide proof of a positive COVID-19 test for that day or she was expected to travel to the courtroom to attend the afternoon portion

6

of the hearing that day. The juvenile court also informed the mother that COVID-19 tests were available in the courtroom if she did not have a test or did not want to purchase one and that she would be allowed to participate via Zoom only if she tested positive for the COVID-19 virus.

The testimony of the witnesses at the hearing set forth the following facts. D'Koya Mathis, the DHR social worker assigned to the children's cases from February 2020 through March 2022, stated that she was not the initial social worker assigned to the children's cases. Mathis explained that because the mother was not initially compliant with DHR reunification services, a DHR supervisor had reassigned Mathis to the children's cases in the hope that Mathis might be able to work more effectively with the mother.

Mathis testified that following M.H.'s birth at a hospital in late August 2020, M.H. remained hospitalized because of complications resulting from having been born with opiates in her system. According to Mathis, in early September 2020, the mother left the hospital where M.H. had been born and "abandoned" M.H. by not returning to the hospital. Morgan County DHR initiated the dependency actions on September 2, 2020, and the children were placed in DHR's custody on that same date.

7

Mathis testified that when the children were first placed in foster care, DHR offered the mother reunification services that included substance-abuse treatment through the Aletheia House, a parenting assessment offered by the Aletheia House, random drug screens on a color-code system, and a psychological evaluation. In addition, DHR asked the mother to obtain and maintain stable housing and employment.

We note that the attorneys for the parties seldom asked, and the two DHR witnesses did not testify, regarding the specific dates on which the mother attempted certain services. However, it is undisputed that between 2020 and 2021, the mother unsuccessfully attempted three substance-abuse programs. Mathis explained that the mother entered the Aletheia House in Huntsville and left that substance-abuse program before completing it. DHR then referred the mother to the Aletheia House program in Rogersville, and the mother failed to complete that program. The mother was then referred to the Aletheia House substance-abuse program in Birmingham, and, again, the mother left that program before completing it. Mathis testified that the three Aletheia House substance-abuse programs each offered the parenting assessment that DHR had

requested for the mother, but that the mother failed to take part in a parenting assessment during her time in those three substance-abuse programs. Mathis also testified that DHR referred the mother for a psychological evaluation with Dr. Barry Wood but that the mother did not complete that evaluation.

In total, DHR conducted nine individualized-service-plan ("ISP") meetings during the time that Mathis was assigned to the children's cases; those ISP meetings were held to address services to be offered to the mother. Mathis stated that the mother had at times seemed interested in obtaining help with her substance-abuse issues but that she did not follow through with reunification services. Mathis stated that when she was initially assigned to the children's cases, the mother communicated well with her, but, she said, that communication became less frequent because the mother moved often and frequently changed her telephone number. Also, the mother was briefly incarcerated twice during the time that Mathis was assigned to the children's cases, although the dates of those incarcerations and the reasons for those incarcerations are not set forth in the record. Mathis stated that during the time that she was assigned to the children's cases, the mother

remained noncompliant with DHR's reunification efforts and did not complete any reunification services.

The mother initially attended her weekly, supervised visitations with the children. However, Mathis testified that the mother appeared at one visitation clearly under the influence of an intoxicant. Mathis testified that the mother initially asserted that she was sober at that visitation. However, Mathis stated that the mother later admitted to Mathis that she had taken some medications that, the mother had claimed, made her drowsy during that visitation. Mathis also testified that the mother did not appear intoxicated at any later visitations with the children.

At some point in the spring of 2021, possibly at a review hearing conducted in early May 2021, the children's guardian ad litem requested that the juvenile court suspend the mother's visitation with the children because the mother had failed to take part in reunification services. On May 5, 2021, the juvenile court entered an order suspending the mother's visitation with the children "until such time as the mother … [is] compliant with [DHR] services as outlined" in the ISP agreements. The

mother's visitation remained suspended at the time of the termination-of-parental-rights hearing in these matters.

In late 2021, the mother gave birth to a third child ("the half-sibling"), born of her relationship with I.P. ("the boyfriend").[2] Following the half-sibling's birth, DHR placed that child in the custody of the boyfriend pursuant to a safety plan. Scott testified that the mother lives with the boyfriend and the half-sibling. Scott also stated that she did not have concerns about the mother's ability to care for the half-sibling. However, Scott stated, the terms of the safety plan required that the boyfriend not allow the mother to be alone with the half-sibling and to supervise the mother's interactions with the half-sibling.

Mathis also testified that although the mother reported being employed at various times after the children were placed in foster care, the mother never provided proof to DHR of her employment. Also, according to Mathis, during the time she was assigned to the children's

---

[2]There is some confusion in the record concerning whether the mother has three or four children. Although one witness referred to the child born in 2021 of the mother's relationship with the boyfriend as the mother's "fourth" child, other references indicate that that child is the mother's third child. No fourth child of the mother's was ever identified in the record. However, the father has a child born of his relationship with a woman other than the mother.

cases, the mother was never able to maintain stable housing. Mathis testified that she inspected one of the mother's homes in 2022 and that it was clean and appropriate for the children. However, Mathis stated that at the time she inspected that home, the mother and her boyfriend informed Mathis that they were in the process of relocating to yet another residence.

Jessica Scott, the DHR social worker assigned to the children's cases between March 2022 and the time of the termination-of-parental-rights hearing, testified that she had seen the mother's most recent residence, which was a two-bedroom apartment that the mother shared with the boyfriend and the half-sibling. Scott stated that the apartment was clean and appropriate for children. However, she said that she believed that the mother needed a larger home to accommodate the addition of the children if they were to be returned to the mother's custody. On cross-examination, Scott admitted that the children could share a bedroom with the half-sibling. However, even assuming that the mother's apartment was large enough, Scott stated, because the mother had failed to comply with reunification efforts, and especially because the

mother had consistently failed to submit to drug screens, DHR had not attempted to transition the children into the mother's home.

Scott testified that when she took over the children's cases in March 2022, which was approximately six months after DHR had filed its termination-of-parental-rights petitions in these matters, the mother still needed to complete a psychological evaluation, substance-abuse treatment, and a parenting assessment. In addition, Scott said, the mother also needed to submit consistently to drug screens. Scott testified that the mother communicated with her regularly and began participating in reunification services in the late spring of 2022. We note that Scott admitted that she had not discussed a parenting assessment with the mother. Scott explained that the parenting assessment had been available through the Aletheia House substance-abuse programs, and that the mother had not availed herself of those services in her three attempts at substance-abuse treatment through the programs from the Aletheia House.

The mother took part in a psychological evaluation with Dr. Lois Petrella on May 25, 2022. Dr. Petrella testified that the mother answered her questions appropriately and that the mother did not appear to be

13

under the influence of drugs or alcohol at the time of that psychological evaluation. However, Dr. Petrella also stated that the mother spent a great deal of time playing on her telephone during the psychological evaluation, although Dr. Petrella stated that the mother's doing so had not been a significant problem. According to Dr. Petrella, the mother's IQ is 92, and most of the mother's diagnoses were normal. However, Dr. Petrella testified that the mother exaggerated her parenting abilities and seemed to be overconfident in those abilities. In addition, Dr. Petrella stated that the mother had informed her that she had last used illegal drugs one year earlier. Dr. Petrella stated that she had wanted to conduct a more thorough parenting assessment on the mother, but, she said, the mother had to leave the psychological evaluation early to take a drug screen. Regardless, Dr. Petrella stated that she would not recommend that the mother be reunited with the children until the mother could demonstrate that she was substance free.

Although DHR recommended inpatient substance-abuse treatment for the mother, the mother attended an outpatient program through Bradford, a substance-abuse-treatment program. She completed that program on June 22, 2022, which was approximately six weeks before the

14

first part of the termination-of-parental-rights hearing. We note that during the pendency of the dependency actions, the juvenile court had ordered the mother to take part in a drug-court program. In response to questioning by the juvenile court, Scott testified that the mother had not complied with that earlier order and had not attended the drug-court program.

The record demonstrates that from late September 2020 through February 10, 2022, the mother failed to submit to any drug screens. The mother tested negative on seven random drug screens administered between February 11, 2022, through June 2, 2022. However, on June 6, 2022, when she was attending the outpatient substance-abuse program, the mother tested positive for opiates. The mother tested negative for opiates on June 13, 2022, July 19, 2022, and July 25, 2022, but she failed to appear for drug screens on June 24, 2022, June 30, 2022, July 14, 2022, and August 1, 2022. The exhibit setting forth all except the last four of the mother's drug screens indicates that, during the 18 months that the children have been in foster care, the mother failed to appear for 78 of the 90 drug screens for which she was eligible on the color-code system, i.e., the mother failed to submit to 87 percent of the drug screens on the

color-code system. The mother also failed to appear for two of the final four drug screens immediately before the termination-of-parental-rights hearing.

According to Scott, even after the mother completed the outpatient substance-abuse program, the mother claimed to have been prescribed opiate pain medication for an unspecified injury to her back. Scott stated that she asked the mother several times for verification of that claim but that the mother never explained the exact nature of her pain and failed to produce a prescription for pain medication.

The mother has not paid any child support for the benefit of the children. Mathis testified that, when the mother had visitation with the children, the mother did not bring any supplies, clothes, or gifts for the children to the visits, and she did not send the children gifts on their birthdays or at Christmas.

Mathis testified that C.I. is an excellent student who, after being placed in foster care, entered the gifted program at her school. Mathis explained that C.I. experienced difficulties with the transition into foster care and that that child had had some behavioral outbursts. For that reason, DHR arranged for C.I. to have individual counseling. According

16

to Mathis, after approximately one year, C.I.'s behavioral issues improved, and DHR ended her individual counseling. However, Scott testified that C.I. was again in counseling at the time of the termination-of-parental-rights hearing because C.I. was upset about the possibility of being permanently separated from the mother.

Dominique Dillard, the psychologist who was treating C.I. at the time of the termination-of-parental-rights hearing, testified that during her first session with C.I., C.I. disclosed that she was being physically abused in the foster home in which she was then residing. Dillard reported that allegation to Scott, and C.I. was immediately moved to another foster home. Dillard stated that after C.I. was removed from the allegedly abusive foster home, C.I.'s outlook and disposition became brighter and more normal. Dillard testified that C.I. is emotionally strong and articulate and that C.I. needs to continue with individual counseling to assist her in moving forward, especially if the mother's parental rights were terminated.

Scott testified that, at some point after she began working on the children's cases, it was discovered that C.I. had been communicating with the mother over social media, apparently on a computer, and by

telephone when she borrowed a foster sibling's telephone. Scott testified that DHR believed that the mother had remained in contact with C.I. from the time that the children had entered foster care, even after the juvenile court suspended the mother's visitation with the children; therefore, she said, that communication was in opposition to the juvenile court's orders. Scott and Dillard each stated that C.I. has a close relationship with the mother and that she wanted to be returned to the mother's custody. Scott stated that, in the new foster home in which C.I. resided at the time of the termination-of-parental-rights hearing, C.I.'s internet access was closely monitored. She also stated that Dillard had agreed to supervise any further communication between the mother and C.I. if the juvenile court were to allow that communication to continue.

Dillard testified that she had recommended that DHR conduct a bonding assessment for C.I. and the mother to determine whether C.I. had a current, beneficial bond with the mother or whether the child's bond with the mother was based on memories of having lived with the mother. Dillard explained that, as is normal for children, C.I. tended to have only positive memories of the mother and that C.I. did not seem to recall the detriment and dysfunction she had experienced while she was

18

in the mother's custody. Scott testified that she had attempted to schedule a bonding assessment for the mother and C.I. but that she was unable to schedule that assessment before the termination-of-parental-rights hearing.

On May 3, 2022, the mother filed in the dependency actions a request that she be allowed to resume visitation with the children. On July 1, 2022, the mother filed in the two termination-of-parental-rights actions a motion to have telephone visitation with C.I.; that motion appears to have been filed shortly after DHR discovered that the mother had been surreptitiously communicating with C.I. The juvenile court denied those motions on July 14, 2022, i.e., on the first day of the termination-of-parental-rights hearing.

Mathis and Scott testified that there were no relatives willing or able to provide a placement for the children. Mathis testified that the mother and the father provided DHR the names of a few relatives but that only one of those relatives, the father's brother, T.I., was either willing to serve as a placement or was deemed to be an appropriate placement for the children. Mathis explained that T.I. had expressed an interest in providing a home for the children but that he did not have

19

stable housing. Scott testified that when she was assigned to the children's cases, she inquired about relative resources but that the mother did not provide the names of any relatives who could serve as a possible relative placement for the children. Scott testified that she contacted T.I. to determine whether his housing situation had stabilized such that he could provide a placement for the children, but, she said, T.I. reported that his housing situation remained unstable.

Mathis and Scott testified that the permanency plan for the children is adoption, and Scott testified that both children are adoptable. Mathis testified that a previous foster mother was willing to adopt M.H. but that that foster mother was not willing to adopt C.I. Both Mathis and Scott testified that, because of the close bond between the children, it was in the children's best interests that they be placed in the same adoptive home. For that reason, Mathis stated, DHR had decided not to allow the previous foster parent to adopt M.H.

Instead, Mathis testified, DHR planned to allow the children to be adopted by another foster parent ("the prospective adoptive resource") with whom the children had not yet resided. Scott explained that the prospective adoptive resource "is willing to adopt these children, but she

would prefer that … the parents' rights be terminated before she starts that relationship." Scott later reiterated that the prospective adoptive resource remained willing to adopt the children but that she wanted to ensure that there was a termination of parental rights first. Scott stated that the prospective adoptive resource could provide the children the individualized attention that they need. Scott also testified that, if for any reason the prospective adoptive resource did not adopt the children, the children's current foster parent was willing to adopt the children to ensure that the children remained together in the same home. However, Scott explained, the current foster parent preferred to allow the children to be adopted by the prospective adoptive resource because the current foster parent had other foster children in her home and could not give the children much individualized attention.

The mother presented no evidence at the termination-of-parental-rights hearing.

At the close of the morning session of the portion of the termination-of-parental-rights hearing on July 14, 2022, the juvenile court again instructed the mother to obtain a COVID-19 test during the lunch break and either to appear for the afternoon session of the hearing or to provide

proof of her positive COVID-19 test. When court resumed after the lunch break, the mother had not appeared in the courtroom or provided proof of a positive COVID-19 test. The mother's attorney represented to the juvenile court that the mother had claimed to him, shortly before the hearing resumed, that she lacked transportation to travel to the courthouse. The juvenile court offered to wait for the mother and to pay for a ride share to transport the mother to the hearing. DHR's attorney stated that DHR was attempting to contact the mother to arrange transportation to bring the mother to the courtroom. The mother's attorney then stated that the mother had just informed him via text message that she was on her way to the courthouse at that time. Court was recessed to wait for the mother to appear.

The hearing resumed at approximately 3:00 p.m., and the mother was not in the courtroom and had not responded to the attempts made by her attorney to contact her. The juvenile court then released DHR and its witnesses from the hearing, but it instructed the mother's attorney to wait an additional 30 minutes to see if the mother arrived in the courtroom. The juvenile court instructed the mother's attorney that if the mother did appear in the courtroom, the mother was to submit to both a

COVID-19 test and to a court-sponsored drug screen. The juvenile court also stated that it would consider the mother's failure to appear when assessing her credibility if she testified at a later portion of the termination-of-parental-rights hearing. The mother did not appear.

The termination-of-parental-rights hearing resumed on August 2, 2022. At the beginning of that part of the hearing, the mother's attorney stated that the mother had informed him that she would be attending that day's hearing, and, although the mother was not present at that time, he speculated that the mother might be on her way to the courtroom. The mother's attorney later checked the hallway outside the courtroom to see if the mother was waiting outside, but, he said, she had not appeared. The juvenile court received additional testimony on August 2, 2022; that testimony is already set forth in this opinion. When the termination-of-parental-rights hearing ended, the mother had still not appeared in the courtroom.

As an initial matter, we note that in her notices of appeal filed in the dependency actions, the mother indicated that she was appealing judgments entered on August 15, 2022, in those actions. However, the record contains no August 15, 2022, judgments entered in the

CL-2022-0917, CL-2022-0918, CL-2022-0919, and CL-2022-0920

dependency actions. The only orders entered in the dependency actions on August 15, 2022, scheduled a hearing via Zoom for February 23, 2023. On August 14, 2022, the juvenile court entered in the dependency actions orders allowing the parties to inspect certain records concerning the children and orders denying the mother's motions to resume her visitation with the children. Even assuming that the mother intended to appeal any or all of those orders, none of those orders is sufficiently final to support the mother's appeals. Moreover, the mother makes no argument concerning any of those orders in her appellate brief. Instead, the mother's arguments on appeal concern only the August 15, 2022, judgments entered in the termination-of-parental-rights actions. Accordingly, we dismiss appeal number CL-2022-0917 and appeal number CL-2022-0919, i.e., the appeals the mother filed in the dependency actions. as moot. Reeves v. Reeves, [Ms. 2200216, Oct. 1, 2021] ___ So. 3d ___, ___ (Ala. Civ. App. 2021); see also C.C. v. L.B., [Ms. 2210410, Nov. 10, 2022] ___ So. 3d ___, ___ (Ala. Civ. App. 2022).

With regard to appeal number CL-2022-0918 and appeal number CL-2022-0920, which are the mother's appeals from the August 15, 2022, judgments entered in the termination-of-parental-rights actions, the

grounds warranting a termination of parental rights are set forth in § 12-15-319, Ala. Code 1975, of the Alabama Juvenile Justice Act ("the AJJA"), § 12-15-101 et seq., Ala. Code 1975. Section 12-15-319 provides, in pertinent part:

"(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In a hearing on a petition for termination of parental rights, the court shall consider the best interests of the child. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:

"....

"(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for the needs of the child.

"....

"(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.

"....

"(9) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of support of the child where the parent is able to do so.

"(10) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the Department of Human Resources, or any public or licensed private child care agency, and agreed to by the parent.

"(11) Failure by the parents to maintain consistent contact or communication with the child.

"(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."

In addition to determining whether a child is dependent and whether grounds exist under § 12-15-319 that support a termination of parental rights, a juvenile court must also "properly consider and reject all viable alternatives to a termination of parental rights." B.M. v. State, 895 So. 2d 319, 331 (Ala. Civ. App. 2004) (citing Ex parte Beasley, 564 So. 2d 950, 954 (Ala. 1990)).

26

"On appeal from ore tenus proceedings, this court presumes the correctness of the juvenile court's factual findings. See J.C. v. State Dep't of Human Res., 986 So. 2d 1172 (Ala. Civ. App. 2007). This court is bound by those findings if the record contains substantial evidence from which the juvenile court reasonably could have been clearly convinced of the fact sought to be proved. See Ex parte McInish, 47 So. 3d 767 (Ala. 2008) (explaining standard of review of factual determinations required to be based on clear and convincing evidence)."

C.C. v. L.J., 176 So. 3d 208, 211 (Ala. Civ. App. 2015).

In its August 15, 2022, termination-of-parental-rights judgments, the juvenile court set forth a number of detailed factual findings, including, in part:

"[DHR] afforded the parents reunification services, but those efforts were not successful. The father never participated in services. The mother was in and out of jail, would start services then stop, or have short periods of sobriety, then relapse. The mother failed to appear for most, if not all, of the hearings regarding the children. [DHR] continued to offer services to the mother throughout the case, including up to the time of the termination-of-parental-rights hearing. However, the mother failed to comply with those services. The mother did not visit with the children from January through May of 2022.[3] The mother started two drug-

_____

[3]In response to questioning, Mathis stated that the mother had not visited the children in 2022 and that she then stated that there had been no visitation between January 2022 and April 2022. Other evidence in the record established that the mother had last visited the children in March 2021.

treatment programs and quit the programs without completing [them].[4] The Court requested that she participate in Family Drug Court, and she did not. The mother had periods of negative drug screens, then would relapse or stop complying with drug screens. She had missed the last two drug screens before the setting of th[e termination-of-parental-rights] hearing. The mother appeared at a visit with the children and appeared to be under the influence. She admitted to taking medicines that made her sleepy but has never presented a prescription to anyone involved in this case, even after numerous requests to do so. The mother finally completed Bradford substance-abuse program but has tested positive since completing that program,[5] and she admitted to being on pain medications in June 2022 to Scott, the social worker in the case at the time, but did not provide proof of the prescription or the underlying reason for the pain medications.

"[DHR] did refer the mother for a psychological evaluation to determine if additional services could be offered. The psychologist noted that the mother was more preoccupied with her telephone than with engaging in the process. There was a second appointment that the mother left early and never completed testing. There were no significant findings which would show that the mother could not parent her children. However, the mother also told the psychologist that

---

[4]The record shows that the mother had attempted three separate substance-abuse programs between 2020 and 2021; the error with regard to this finding is not material.

[5]The record does not contain any evidence indicating that the mother tested positive after she completed the Bradford substance-abuse program on June 22, 2022. Rather, the mother tested positive on June 2, 2022, while still participating in that program, and she failed to participate in four drug screens scheduled between June 22, 2022, and August 1, 2022, which was the day before the last day of testimony in the termination-of-parental-rights hearing.

she had no drug issues and had not used drugs in more than a year. This is not what the evidence bore out in court.

> "[T]he mother appeared through Zoom for the first four hours of the termination-of-parental-rights hearing. The court did observe concerning behavior, such as moving around the residence a lot and points of inattention. Given some concerning behavior over the Zoom link, the failure of the mother to produce any screening or other medical paperwork on her claimed COVID issues, and the recent missed drug screens, the court ordered the mother to appear in court for the second part of the day. The mother was present on Zoom when ordered and stated she understood. The mother never appeared to the court thereafter."

In addition to the foregoing, in its August 15, 2022, judgments, the juvenile court found that the children remained dependent, that DHR had made reasonable efforts toward reunification, that the mother was unable or unwilling to adjust her circumstances to meet the needs of the children, that there were no viable alternatives to the termination of the mother's parental rights, and that the termination of the mother's parental rights would serve the children's best interests.

The mother first argues that the juvenile court erred in determining that the evidence in the record supports the juvenile court's determination that there were grounds under § 12-15-319 warranting the termination of her parental rights. We note that the mother does not dispute that she has an extensive history of drug use, that she did not

comply with reunification services until six months after DHR filed its termination-of-parental-rights petitions, and that she missed 87% of her drug screens even when that failure to participate in those screens resulted in the continued suspension of her visitation with the children, and that she failed to rebut the results of her positive drug screens by producing evidence of prescriptions she claimed to have for opiate pain medication.

Instead, in her argument on this issue, the mother asserts that the juvenile court failed to consider "evidence of [her] current conditions or conduct" in determining that she was unwilling or unable to meet the children's needs. See D.O. v. Calhoun Cnty. Dep't of Hum. Res., 859 So. 2d 439, 444 (Ala. Civ. App. 2003). The mother contends in her appellate brief that the evidence demonstrated that, at the time of the termination-of-parental-rights hearing, her circumstances were changing and she was making progress toward reunification. The mother alleges that she had stable housing at the time of the termination-of-parental-rights hearing and that she has demonstrated her ability to parent a child because she is currently living with the boyfriend and the half-sibling. We note, however, that the record indicates that the mother obtained her current

30

housing sometime after March 2022, and, therefore, at the time of the termination-of-parental-rights hearing, she had had that housing, at most, for only four months.[6] Further, the mother's youngest child, the half-sibling, is in the custody of the boyfriend, who is not the children's father, pursuant to a safety plan that specifies that the mother not be left alone with that child. Therefore, the record does not demonstrate that the mother is successfully parenting that child on her own or without supervision and assistance.

The mother also contends that she completed some of the reunification services and that, beginning in the spring of 2022, she began communicating regularly with Scott about participating in those reunification services. The mother argues that the juvenile court failed to consider her current conditions, i.e., the completion of the psychological evaluation and the substance-abuse program. The mother also contends in her appellate brief that she has maintained employment, but the record contains no evidence concerning the mother's employment. We also note that the mother does not address her failure to attempt to

---

[6]Scott testified that she had seen the mother's two-bedroom apartment, but she did not state the date on which she visited that home.

contribute to the children's support. Regardless, the mother contends that the juvenile court improperly based its termination decision solely on her past conduct, i.e., the conduct she exhibited before the late spring of 2022.

This court has held that "[e]vidence of a parent's past conduct is admissible if it assists the juvenile court in assessing and weighing the evidence regarding current conditions, but evidence of past conditions cannot be the sole basis for finding a child to be dependent." J.P. v. D.P., 260 So. 3d 862, 872 (Ala. Civ. App. 2018). As was pointed out during the termination-of-parental-rights hearing, the mother attended an out-patient substance-abuse program rather than a recommended in-patient program. Further, the mother failed to appear for four requested drug screens between the time the mother completed the substance-abuse program and the conclusion of the termination-of-parental-rights hearing. Moreover, the mother did not appear at either day of the termination-of-parental-rights hearing. The juvenile court expressly stated that it had wanted the mother to submit to a drug screen during the termination-of-parental-rights hearing. The juvenile court could have interpreted the mother's failure to appear at the termination-of-parental-

32

rights hearing, especially after she assured her attorney that she would be present, as an attempt to avoid submitting to a drug screen during the termination-of-parental-rights hearing. The juvenile court noted in its judgment that the mother had had periods of sobriety followed by times when she would again relapse. Thus, the record and the juvenile court's findings in its judgments demonstrate that the juvenile court did not rely solely on the mother's past conduct in reaching its decision to terminate the mother's parental rights to the children. See J.C. v. State Dep't of Hum. Res., 986 So. 2d 1172, 1195 (Ala. Civ. App. 2007) (holding that the juvenile court did not err in considering a parent's past conduct when "[t]he evidence showed that the mother had a history of abstaining from drugs for extended periods of time only to use drugs again months later"); T.W. v. Shelby Cnty. Dep't of Hum. Res., 293 So. 3d 386, 393 (Ala. Civ. App. 2019); and M.E. v. Shelby Cnty. Dep't of Hum. Res., 972 So. 2d 89, 101 (Ala. Civ. App. 2007) (plurality opinion). Moreover, in this case, the evidence supports a conclusion that the mother had failed, or was likely to have failed, to maintain her sobriety at the time of the termination-of-parental-rights hearing, and, therefore, that she was unable or unwilling to properly parent the children.

We agree with the mother that the evidence indicates that, beginning approximately six months after DHR filed its termination-of-parental-rights petitions, she began making efforts to reunite with the children. However, the juvenile court could have considered those late attempts to cooperate with DHR reunification services to be merely unpersuasive, last-minute efforts intended only to forestall termination rather than legitimate efforts by the mother to change her circumstances. A.M.F. v. Tuscaloosa Cnty. Dep't of Hum. Res., 75 So. 3d 1206, 1213 (Ala. Civ. App. 2011); K.J. v. Pike Cnty. Dep't of Hum. Res., 275 So. 3d 1135, 1145 (Ala. Civ. App. 2018). This is particularly true here, where the mother had failed to appear for several drug screens shortly before the termination-of-parental-rights hearing and where the juvenile court could have interpreted the mother's failure to attend either day of that hearing as an effort to avoid submitting to a court-ordered drug screen. Given the totality of the evidence, particularly that evidence that relates to the mother's substance-abuse issues, we cannot say that the mother has demonstrated that the juvenile court erred in determining that there were grounds under § 12-15-319 that served as bases for the termination of her parental rights.

The mother, citing J.C. v. Madison County Department of Human Resources, 293 So. 3d 901, 904 (Ala. Civ. App. 2019), argues that DHR failed to show that her substance-abuse issues impacted her ability to parent the children. In J.C., the Madison County Department of Human Resources ("Madison County DHR") failed to present evidence concerning the reason the child in that case had been removed from his mother's custody and placed in the custody of Madison County DHR. It was undisputed that the child in that case, who was a teenager, shared a close bond with the mother such that a social worker stated that any permanent placement for the child that was not with the mother was not likely to be successful. This court reversed the judgment terminating the mother's parental rights, concluding that "[Madison County] DHR presented no evidence that the mother's drug use, although long-standing and certainly not a desirable trait, has ever impacted her ability to rear the child." J.C. v. Madison Cnty. Dep't of Hum. Res., 293 So. 3d at 909. This court further explained:

> "The record contains no evidence indicating the basis for [Madison County] DHR's initial involvement with the mother and the child. Although [Madison County] DHR established that the mother had a history of drug use, it did not present evidence indicating that the child suffered neglect or abuse at the hands of the mother as a result of her drug use. In fact,

> the evidence [Madison County] DHR presented was to the effect that the child was generally polite and respectful and that he excelled in school, both at the time of his removal from the mother's custody and at the time of the trial."

J.C. v. Madison Cnty. Dep't of Hum. Res., 293 So. 3d at 908-09 (footnote omitted).

Similarly, the mother relies on another case in which the Jefferson County Department of Human Resources ("Jefferson County DHR") sought to terminate a mother's parental rights to her youngest child. See P.S. v. Jefferson Cnty. Dep't of Hum. Res., 143 So. 3d 792 (Ala. Civ. App. 2013). In P.S., Jefferson County DHR had been involved with the mother regarding her older children, and, upon the child's birth, Jefferson County DHR filed a dependency petition alleging that the mother could not take care of the child based on her past conduct with regard to her older children. The Jefferson Juvenile Court relieved Jefferson County DHR of its obligation to provide reunification services for the mother and the child in that case. Later, Jefferson County DHR filed a petition seeking to terminate the mother's parental rights, and the Jefferson Juvenile Court granted that petition. This court reversed, explaining:

> "[Jefferson County] DHR failed to present evidence indicating that the mother was unwilling to parent the child or describing the conduct or condition that made the mother

36

> unable to parent the child. In other words, [Jefferson County] DHR never revealed the mother's parenting defect. Although we understand that, according to [Jefferson County] DHR, at some point in 2008 the mother failed to protect K.F. [(another of the mother's children)], our review of the record reveals no evidence presented to the juvenile court that supports [Jefferson County] DHR's assertion regarding K.F. Even assuming that [Jefferson County] DHR's assertion is correct, the record contains no evidence presented by [Jefferson County] DHR regarding the mother's inability or unwillingness to discharge her parental responsibility to the child."

P.S. v. Jefferson Cnty. Dep't of Hum. Res., 143 So. 3d at 797. In that case, this court also held that "[Jefferson County] DHR did not provide the mother the opportunity to correct any conduct or condition that might have been a barrier to reunification with the child." P.S. v. Jefferson Cnty. Dep't of Hum. Res., 143 So. 3d at 798.

The mother in this case contends that the facts of her case are similar to those of J.C., because, she says, the evidence demonstrates that C.I. is an intelligent child with whom she shares a close bond. The mother also argues that because she had parented C.I. before DHR's involvement, there is no evidence in the record that her substance-abuse issues would prevent her from successfully parenting the children. The mother also contends that, as in P.S., DHR in this case did not identify

the "parenting defect" that would prevent her from reuniting with the children.

In this case, however, unlike in J.C., there is no evidence in the record indicating the longevity of the mother's substance-abuse issues. Therefore, although the record in this case shows that the mother was perhaps successfully parenting C.I. before DHR's involvement with the family, the record does not show when the mother began abusing drugs and whether the mother was abusing drugs during a period while C.I. was in the mother's custody.

More significantly, unlike in J.C., and P.S., the record in this case does contain evidence demonstrating how the mother's substance-abuse issues impacted her ability to parent. For example, when M.H. tested positive for opiates at the time of her birth, the mother checked herself out of the hospital, leaving M.H. at that hospital, and the mother did not return; Mathis testified that the mother had "abandoned" M.H. Thus, the evidence supports a conclusion that the mother's substance-abuse problem resulted in her instinct being to protect herself or her ability to continue to abuse drugs, rather than to attempt to care for her hospitalized infant. Also, the social workers in J.C., had not seen the

mother in that case under the influence. In this case, Mathis testified that the mother appeared under the influence at a DHR-supervised visitation with the children and that the mother eventually admitted to have taken medications that made her sleepy during that visitation. The juvenile court could have determined that that side effect the mother described was a result of the opiates the mother was taking, i.e., sleepiness, would impact the mother's ability to parent the children. Such a conclusion would be concerning especially with regard to the mother's ability to parent M.H., who was 22 months old at the time of the termination-of-parental-rights hearing. Furthermore, Dr. Petrella testified that she recommended that the mother demonstrate that she was maintaining her sobriety before reuniting the mother with the children. Given the foregoing, it is clear that DHR presented evidence that the children were removed from the mother's custody because of her use of illegal drugs or abuse of prescription medication and that the mother's substance abuse impacted the mother's ability to properly and safely parent the children and was the primary bar to the mother's reunification with the children. We cannot say that the mother has demonstrated that the evidence did not support a conclusion that her

substance-abuse issues impacted her ability to care for and parent the children.

The mother also argues on appeal that the juvenile court erred in concluding that DHR had made reasonable efforts toward reuniting her with the children. As the mother contends, DHR has the responsibility to provide services designed to reunite a parent and his or her child or children. H.H. v. Baldwin Cnty. Dep't of Hum. Res., 989 So. 2d 1094, 1104-05 (Ala. Civ. App. 2007) (plurality opinion).

> "The natural starting point in any fair and serious attempt to rehabilitate the parent and to reunite the parent with the child is identification of that characteristic, conduct, or circumstance that renders the parent unfit or unable to discharge his or her parental responsibilities to the child. Once DHR identifies the source of parental unfitness, the overarching goal of family reunification requires DHR to communicate its concerns to the parent and to develop a reasonable plan with the parent that is tailored toward the particular problem(s) preventing the parent from assuming a proper parental role. DHR should use reasonable methods to achieve its plan of removing or reducing the identified obstacle(s) to family reunification 'as quickly and as safely as possible.' Ala. Code 1975, § 12-15-1(3). Finally, at the termination of any rehabilitation process, DHR should determine the success of its efforts, using reasonable evaluation tools. See In re Vincent B., 73 Conn. App. 637, 644-47, 809 A.2d 1119, 1124-25 (2002) (holding that the burden is on state child-protection agency to make 'reasonable efforts to achieve reunification by engaging the [parent] and making available services aimed at instilling in him [or her] healthy parental skills,' to give the parent 'a window of opportunity

during which reasonable efforts at reunification should have been made,' to apprise the parent of the steps to be taken to achieve rehabilitation, and to give the parent feedback on his or her progress in reaching that goal)."

H.H. v. Baldwin Cnty. Dep't of Hum. Res., 989 So. 2d at 1105 (footnote omitted).

As part of her argument on this issue, the mother contends that DHR, through Scott, should have offered her a parenting assessment in spring 2022, when she began to comply with DHR reunification efforts. In asserting that argument, the mother overlooks that on May 25, 2022, Dr. Petrella attempted to conduct a parenting assessment during the psychological evaluation, but that the mother left that evaluation early and did not return to complete that assessment.

The mother also criticizes DHR for not arranging for the bonding assessment recommended by Dillard for C.I. and the mother. However, Scott testified that she had attempted to schedule that bonding assessment but that no appointments had been available before the termination-of-parental-rights hearing. The mother only truly began to attempt reunification services six months after DHR filed its termination-of-parental-rights petitions, and only approximately three or four months before the termination-of-parental-rights hearing. However,

41

Dillard, who recommended the bonding assessment, had only been counseling C.I. for approximately three or four weeks before the termination-of-parental-rights hearing began, and it appears that Dillard's recommendation for the bonding assessment was made only shortly before that hearing began. Thus, the juvenile court could have determined that the delay in identifying the possible need for a bonding assessment, and DHR's inability to schedule that assessment before the termination-of-parental-rights hearing, was not the fault of DHR social workers. Moreover, Scott testified that because it was undisputed that the mother and C.I. have a close bond, the bonding assessment was not truly necessary to establish that fact. Thus, the juvenile court could have determined that the failure to conduct the bonding assessment, if it were error on the part of DHR, was harmless.

The mother also argues that DHR could have offered her counseling, as was recommended by Dr. Petrella in her recommendations set forth after the mother's psychological evaluation in late May 2022. However, it is not clear whether such counseling could have been implemented in the approximately seven weeks between that psychological evaluation and the termination-of-parental-rights hearing.

We also note that the juvenile court could have considered that the mother's earlier refusal or failure to attempt to complete DHR reunification services resulted in the recommendation for individual counseling being made so late in the process that if it had been possible to schedule counseling for the mother immediately, only a few sessions could have been held before the termination-of-parental-rights hearing was conducted. Further, the juvenile court could have determined that individual counseling for the mother would have been beneficial only if the mother had established that she could maintain sobriety.

According to the mother, DHR did not offer her the ability to undergo drug screening following her completion of the substance-abuse program in late June 2022. That allegation is not supported by the evidence in the record, which demonstrates that the mother twice tested negative for drug use after her completion of the substance-abuse program and that she failed to appear at four additional, DHR-requested drug screens. More significantly, the mother's failure to appear at the termination-of-parental-rights hearing prevented the mother from submitting to a drug screen ordered by the juvenile court.

DHR offered the mother a number of services for 18 months before the mother began to seriously attempt reunification with the children, and those efforts began, at most, 3 or 4 months before the termination-of-parental-rights hearing began. DHR did implement services for the mother in late spring 2022, well after the termination-of-parental-rights petitions had been filed, and the mother participated in some services immediately before the termination-of-parental-rights hearing. However, the record supports a conclusion that those services were not successful in assisting the mother in adjusting her circumstances to meet the needs of the children. "'At some point, … the child[ren]'s need for permanency and stability must overcome the parent's good-faith but unsuccessful attempts to become a suitable parent.'" H.H. v. Baldwin Cnty. Dep't of Hum. Res., 989 So. 2d at 1105 n.5 (quoting M.W. v. Houston Cnty. Dep't of Hum. Res., 773 So. 2d 484, 487 (Ala. Civ. App. 2000)). We cannot say that the juvenile court erred in determining that DHR made reasonable efforts to reunite the mother with the children.

The mother last argues that the juvenile court erred in determining that there were no viable alternatives to the termination of her parental rights. The mother cites a plurality opinion for the proposition that a

44

viable alternative to termination would be to place the children with a "third party." See M.E. v. Shelby Cnty. Dep't of Hum. Res., 972 So. 2d 89 (Ala. Civ. App. 2007) (plurality opinion). In that case, the plurality opinion stated:

> "Although it appears that the mother may never rehabilitate to the point that she can reunify with her children, termination of parental rights is not the only potential alternative. Placement with third parties, such as willing and suitable relatives, see Ex parte J.R., 896 So. 2d 416 (Ala. 2004), foster parents, but see R.L.B. v. Morgan County Dep't of Human Res., 805 So. 2d 721 (Ala. Civ. App. 2001) (asserting that foster care is not a viable alternative when there is no opportunity for rehabilitation and reunification), or group homes, see State Dep't of Human Res. v. A.K., 851 So. 2d 1 (Ala. Civ. App. 2002), with varying degrees of parental visitation rights, may be a reasonable and less drastic alternative to termination of parental rights."

M.E. v. Shelby Cnty. Dep't of Hum. Res., 972 So. 2d at 103.

In relying on M.E., supra, the mother contends that DHR failed to consider placing the children in the home she shares with her boyfriend. The mother contends that because she is successfully parenting the half-sibling while under the boyfriend's supervision, the children could also be placed in the home under the boyfriend's supervision. However, the mother did not identify to DHR or to the juvenile court the possibility of the boyfriend serving as a placement alternative for the children. Thus,

she is raising that argument for the first time on appeal. See Andrews v. Merritt Oil Co., 612 So. 2d 409, 410 (Ala. 1992) ("[An appellate court] cannot consider arguments raised for the first time on appeal; rather, [its] review is restricted to the evidence and arguments considered by the trial court.").

Moreover, under the AJJA, a "relative" is

"[a]n individual who is legally related to the child by blood, marriage, or adoption within the fourth degree of kinship, including only a brother, sister, uncle, aunt, first cousin, grandparent, great grandparent, great-aunt, great-uncle, great great grandparent, niece, nephew, grandniece, grandnephew, or a stepparent."

§ 12-15-301(14), Ala. Code 1975. The boyfriend is not the children's relative, and there is no indication in the record that the children know or have met the boyfriend. Furthermore, the evidence indicates that the mother may not have been sober even while she has been living with the boyfriend and the half-sibling. Therefore, the evidence supports a conclusion that, if the mother has not maintained her sobriety, the boyfriend has not noticed or has failed to notify DHR.

Although we recognize that the mother and C.I. share a close bond, the record also demonstrates that C.I. and M.H. are closely bonded and should remain in a placement together. DHR presented evidence that the

children are adoptable and that there is an adoptive resource for the children that would allow them to remain together in the same home. "In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved." A.R.E. v. E.S.W., 702 So. 2d 138, 140 (Ala. Civ. App. 1997). Given the evidence in the record, we cannot say that the juvenile court erred in determining that there were no viable alternatives to the termination of the mother's parental rights and that the best interests of the children were served by the judgments terminating the mother's parental rights.

CL-2022-0917 -- APPEAL DISMISSED.

CL-2022-0919 -- APPEAL DISMISSED.

Moore, Edwards, Hanson, and Fridy, JJ., concur

CL-2022-0918 -- AFFIRMED.

CL-2022-0920 -- AFFIRMED.

Edwards, Hanson, and Fridy, JJ., concur.

Moore, J., concurs in the result, without opinion.